ENVIRONMENTAL ACTION and Consumer Federation of America, Petitioners,

and

The Wisconsin Public Power, Inc. System, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Arizona Public Service Company, et al., Intervenors.

Nos. 91–1403, 91–1404.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1992.

Decided July 2, 1993.

As Amended July 2, 1993.

Samuel Sooper, Counsel, Federal Energy Regulatory Commission ("FERC"), argued the cause for respondent. With him on the brief were William S. Scherman, Gen. Counsel, FERC, and Jerome M. Feit, Sol., FERC.

Michael E. Small filed a joint brief for intervenors.

Louis E. Vincent entered an appearance for intervenor Western Systems Power Pool.

Alan J. Statman entered an appearance for intervenor Southwestern Public Service Co.

Channing D. Strother, Jr. entered an appearance for intervenor City of Vernon, CA.

Thomas L. Blackburn entered an appearance for intervenor Century Power Corp.

Michael Hindus entered an appearance for intervenor Pacific Gas and Elec. Co.

Charles H. Cochran and Judy Grier Smylie entered appearances for intervenor Sacramento Mun. Utility Dist.

Vicki G. Sandler entered an appearance for intervenor Arizona Public Service Co.

Donald A. Kaplan entered an appearance for intervenor British Columbia Hydro & Power Authority.

James D. Pembroke entered an appearance for intervenors Modesto Irrigation Dist. and City of Santa Clara, CA. Wallace L. Duncan and Richmond F. Allan also entered appearances for intervenor Modesto Irrigation Dist.

Robert C. McDiarmid and Lisa G. Dowden entered appearances for intervenor Northern California Power Agency.

Mary Rose Hughes entered an appearance for intervenor Puget Sound Power & Light Co.

Edward C. Farrell entered an appearance for intervenor Dept. of Water and Power of the City of Los Angeles.

Edward W. O'Neill entered an appearance for intervenor The California Public Utilities Com'n.

Kenneth G. Lee entered an appearance for intervenor Nevada Power Co.

Helen J. Edwards entered an appearance for intervenor Pacificorp d/b/a Pacificorp Elec. Operations.

Clark Evans Downs entered an appearance for intervenors Public Service Co. of Oklahoma and Southwestern Elec. Power Co.

E. Gregory Barnes entered an appearance for intervenor San Diego Gas & Elec. Co.

Ann P. Cohn entered an appearance for intervenor Southern California Edison Co.

Floyd L. Norton IV entered an appearance for intervenors Tucson Electric Power Co., Entergy Services, Inc., and the Montana Power Co. Don P. Garber also entered an appearance for intervenor Entergy Services, Inc.

David P. Yaffe entered an appearance for intervenor Turlock Irrigation Dist.

Diana Mahmud entered an appearance for intervenor The Metropolitan Water District of Southern California.

Scott Hempling (for Environmental Action & Consumer Federation of America) and Michael P. May (for Wisconsin Public Power, Inc. System) argued the cause for petitioners. With them on petitioners' joint brief were Robert Kelter (for Environmental Action & Consumer Federation of America) and J. Leroy Thilly and Anita T. Gallucci (for Wisconsin Public Power, Inc. System).

Before RUTH BADER GINSBURG, BUCKLEY, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Petitioners seek review of two orders of the Federal Energy Regulatory Commission approving the Western System Power Pool. Their principal claim is that the Commission erred in allowing a flexible pricing arrangement for the sale and exchange of energy and energy transmission services among the members of the Pool while not requiring that they provide each other with access to their transmission lines at cost. Finding the Commission's action soundly reasoned and substantially supported, we deny the petitions.

## I. BACKGROUND

For almost a decade, the Federal Energy Regulatory Commission ("FERC") has been experimenting with power pooling arrangements capable of delivering surplus electricity on a flexible, market-priced basis. In this case, we are asked to review two FERC rulings that authorized, apparently for the first time, the permanent operation of such a pool.

The Commission's interest in the market pricing of electric power traded between utilities dates from its approval of the so-called Southwest Bulk Power Experiment in 1983. *Public Service Co. of New Mexico*, 25 F.E.R.C. ¶ 61,469 (1983) ("*Southwest Experiment*"). In that two-year test, FERC aban-

doned its traditional practice of linking the price of bulk electricity to cost. It agreed to permit market pricing instead, on the condition that the experiment's six participating utilities would sell transmission services to one another at a pre-specified rate, and that no sale of power would be priced at more than twice the cost-based rate. *Southwest Experiment,* 25 F.E.R.C. ¶ 61,469, at 62,029, 62,046. FERC believed the transmission requirement was crucial to the promotion of competition, as it would enable participants to trade bulk power with all participating utilities, not just those with which they were directly interconnected. *Id.* at 62,045–46.

In 1987, FERC approved the Western System Power Pool ("WSPP" or "Pool") as a follow-up to the Southwest Bulk Power Experiment and required the participants to retain independent consultants to monitor and report on the Pool's operation. *Pacific Gas & Electric Co.,* 38 F.E.R.C. ¶ 61,242, at 61,781–82, 61,802–03 (1987) *("PG & E I ").* The new pool began with 15 utilities serving 40 million customers in ten western states, and membership was opened to all utilities connected to the existing members by transmission lines. *See* Strategic Decisions Group, Western Systems Power Pool Assessment ES–1 (Jan.1991) ("SDG Report"); *see also PG & E I,* 38 F.E.R.C. ¶ 61,242, at 61,782–83. The terms of the Pool Agreement differed in significant respects from those involved in the Southwest Bulk Power Experiment. The Agreement provided for the more liberal capping of energy prices, which were to be based on the costs of the highest-cost participant. *PG & E I,* 38 F.E.R.C. ¶ 61,242, at 61,782. It did not mandate open access to transmission services at cost; rather, these services, like various categories of energy, were to be sold or exchanged at flexible rates. *Id.*

The most important feature of the Agreement was its establishment of a "hub" or "electronic bulletin board" to provide WSPP members with information about trading opportunities. The hub consisted of a centralized computer that received daily offers to buy or sell energy and transmission services, incorporated them into a standard form, and transmitted the information electronically to

all WSPP members. *Id.* at 61,783. Although the hub itself did not execute sales or exchanges, it provided information about trading possibilities that interested participants could follow up and negotiate directly. *See* SDG Report at 1–3 to 1–4.

During the WSPP's experimental period, FERC approved market-priced sales of various categories of energy or transmission "products." The energy products traded were "economy energy," "unit commitment service," and "firm system capacity/energy sale or exchange service"; the transmission products were "nonfirm service," "standby service," and "firm (or priority) service." *See* SDG Report at 1–2 to 1–3. The differences between these products are defined by the firmness of the seller's pledge to provide the promised energy or transmission. Nonfirm transmission is interruptible during the next scheduled hour; standby transmission is interruptible subject to an agreed-upon notice period; and firm service is ordinarily not interruptible. *Id.* at 1–2. Turning to the energy services, economy energy is energy subject to immediate interruption upon notification; unit commitment service is service from a specified generating unit for a specified period; and firm system capacity/energy sale or exchange service is an agreement for selling or exchanging system capacity backed by reserves. *Id.* at 1–3. The energy products, together, are sometimes referred to as coordination services.

Throughout the experimental period, FERC emphasized that one of the Pool's primary purposes was to reduce costs through coordination—that is, to ensure that electricity is always generated by the least expensive means available, then moved through purchase or exchange to where it is needed. *See, e.g., PG & E I,* 38 F.E.R.C. ¶ 61,242, at 61,782 ("The Experiment will . . . be valuable to the Commission because it will . . . provide the Commission with significant data on the Experiment's effect on efficiency, competition and coordination in the bulk power industry.").

On December 31, 1990, the Strategic Decision Group ("SDG"), the consulting firm retained by WSPP, issued its report. SDG described the Pool as "an unqualified suc-

cess," SDG Report at ES–10, and determined that it had saved consumers $71 million through increased competition and the coordination of trades among the member utilities, *id.* at ES–4. SDG calculated the savings by subtracting the dollar value of trades (both sales and exchanges) made possible by the WSPP from the buyers' costs of obtaining electricity in the absence of the Pool. *Id.* SDG found that the Pool promoted efficiency principally by providing utilities with both information and a flexible regulatory environment. *See generally id.* at ES–3 (listing the ways in which the WSPP improved utilities' operations). Finally, it estimated that approximately one percent of all the electricity generated by WSPP members was exchanged through trades made possible by the WSPP. *Id.* at 3–9.

Upon publication of the consultant's report, Pacific Gas and Electric Company, on behalf of the other WSPP participants, petitioned FERC to allow the Pool to operate permanently. *See Western Systems Power Pool,* 55 F.E.R.C. ¶ 61,099, at 61,301 (1991) (*"Acceptance Order"*). By that time, the WSPP had grown to 40 members representing one quarter of the nation's electrical generating capacity, and it covered most of a wedge stretching from Louisiana to British Columbia and west to the Pacific. *See id.* Of the 40 members, 21 were subject to FERC's jurisdiction, while 19 (government-owned utilities) were not. *Id.* at 61,301 & n. 6. The WSPP sought to continue its existing arrangement allowing for price flexibility beneath a cap based on the costs of the highest-cost WSPP member. *Id.* at 61,301 & n. 4, 61,302 & n. 8 (noting that the Pool sought to perpetuate the experimental rates); *Pacific Gas & Electric Co.,* 50 F.E.R.C. at ¶ 61,339, at 62,001 (1990) (*"PG & E II"*) (noting that the experimental rates for energy were based on the costs of highest cost generating source and that those for transmission were comparable to the cost of recently constructed transmission lines).

By the time of the WSPP application, however, prior FERC orders had expressed uneasiness over the high experimental price ceilings and the possibility that sellers of services under the Pool Agreement could wield "market power" to the disadvantage of buyers. *See PG & E II,* 50 F.E.R.C. ¶ 61,-339, at 62,002–03. In particular, FERC appeared to be concerned about the WSPP's "transmission-dependent" utilities, namely those whose links to the nation's electrical grid are controlled by a single entity. In *PG & E II,* it specifically requested that the Pool address, in the context of its upcoming request to operate permanently, issues of transmission access and market power. *Id.*

In response, the WSPP application proposed the so-called "Exhibit C transmission principles." These "principles" required member utilities to provide transmission services to other members on reasonable terms. In theory, such access would open new markets for transmission-dependent utilities, break the monopoly power of those controlling transmission facilities, and eliminate exorbitant prices. After the WSPP application was docketed, petitioners Environmental Action Incorporated ("EA"), Consumer Federation of America ("CFA"), and the Wisconsin Public Power Incorporated System ("WPPI"), among others, intervened in the proceedings.

On April 23, 1991, FERC accepted the WSPP's application with major modifications. *Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,324. Most importantly, it found that Exhibit C did not go far enough in opening access to transmission lines, providing trading opportunities, and mitigating market power. *See id.* at 61,317–20. It found as well that ordering more stringent transmission-access requirements would jeopardize the continued existence of the Pool because of its members' opposition to such commitments. *Id.* at 61,320–21.

Accordingly, on its own initiative and as an alternative to the WSPP's system of caps based on the costs of its highest cost participants, FERC developed and published uniform energy and transmission rate ceilings. *Id.* at 61,321–22. These were designed to reflect the costs of a "hypothetical" average utility and were set at about half the level of the ceilings in force during the experiment. *Id.* at 61,324–25. FERC established the ceilings on the basis of data filed with the Com-

mission by the Pool's FERC-regulated members. *Id.* at 61,321 n. 81, 61,325.

Finally, on rehearing, the Commission modified and clarified its April 23 order. *Western Systems Power Pool,* 55 F.E.R.C. ¶ 61,495 (1991) (*"Clarification Order"*). Most significantly, it required that quarterly WSPP transaction reports be filed by FERC-regulated utilities so that both FERC and the WSPP membership could guard against excessive or discriminatory pricing, *id.* at 62,716–17, and it permitted the WSPP to rescind the Exhibit C principles on the ground that they were unnecessary in light of the cost-based ceilings. *See id.* at 62,715. The *Clarification Order* also denied petitioners' request for company-specific and product-specific price regulation. *Id.* at 62,717–18. These petitions followed.

## II. DISCUSSION

### A. Standing

■ At the outset, FERC and the WSPP challenge petitioners' standing to request review of the Commission's orders, claiming that they have suffered no legal injury. Because we find EA has standing, and because once one petitioner has demonstrated standing we may permit the participation of others, all petitioners are properly before this court.

EA's standing to represent its members' interests is judged according to the familiar principles of *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Under *Hunt,* organization enjoys standing to present the claims of members if

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* That EA meets the last two criteria is not disputed. It therefore will have standing if and only if one of its ratepayer-members would as well.

In its most recent case addressing the constitutional standing doctrine, the Supreme Court reminds us that "the irreducible constitutional minimum of standing contains three elements": "injury in fact," "a causal connection between the injury and the conduct complained of," and the likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). As evidence that it satisfies these requirements, EA has provided this court with an affidavit attesting that some of its members live within the WSPP service area and have suffered economic injury as a consequence of FERC's refusal to order company-specific and product-specific pricing. That this claim satisfies the causation and redressability prongs of the *Lujan* test is undeniable: The injuries are alleged to have resulted from FERC's failure to adopt the requested pricing policies and would be redressed by a court order requiring the Commission to do so.

FERC argues, however, that EA's members have not suffered a constitutional injury in fact from FERC's approval of the WSPP application; therefore, they lack standing. It contends that, in order to show legal injury, EA must demonstrate that its affected members would have been better off had the Commission disapproved the application in its entirety. Because the undeniable effect of the Pool has been to reduce the price of electric power to retail ratepayers, the Commission asserts that it is doubtful that EA could show that its members would have been better off if the Pool did not exist. This argument, of course, ignores EA's actual claim, which is that its members were injured by the agency's failure to modify the WSPP arrangement as requested by petitioners.

We see no reason why injury in fact should be measured against what would have been the members' lot had FERC disapproved the WSPP entirely. FERC had authority not only to approve or disapprove the filing, but to require modifications of the Pool Agreement as a condition of approval. Just as ratepayers may challenge orders that improve their lot but do not go far enough in doing so, so may EA properly claim that its members were injured by the Commission's

failure to impose more stringent limitations on the prices that WSPP utilities would be allowed to charge.

Certain of its members having met the requirements for standing, EA may bring this action; and because EA may do so, we permit all three petitioners to appear before us. *See Center for Auto Safety v. NHTSA,* 793 F.2d 1322, 1328–29 n. 41 (D.C.Cir.1986) (where one petitioner has standing, a "lack of standing" in others "does not require dismissal of the case").

## B. The Merits

### 1. *Flexible Pricing in the Absence of Transmission Access*

Petitioners' principal contention is that FERC improperly failed to order either open access to transmission lines or company-specific, product-specific pricing within the WSPP. Their theory is that prices must closely track costs of service, whether through the indirect compulsion of the market or the direct command of the Commission. As a basis for their contention, they raise three separate legal objections: The rate ceilings approved by FERC are not just and reasonable; the ceilings permit discriminatory pricing; the ceilings mark a departure from Commission precedent. We disagree on all counts.

### a. *Just and Reasonable Rates*

■ Section 205(a) of the Federal Power Act ("FPA"), 16 U.S.C. § 824d(a) (1988), provides that

[a]ll rates and charges made . . . in connection with the transmission or sale of electric energy subject to the· jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable . . . .

Petitioners contend that FERC acted arbitrarily and capriciously in finding the ceiling rates it imposed to be just and reasonable. We recently affirmed the following standard for reviewing such claims:

Issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission. Not surprisingly, therefore, our review is deferential. In determining whether the FERC's decision that a rate design is "just and reasonable," 16 U.S.C. § 824d(a), we require only that the agency have made a reasoned decision based upon substantial evidence in the record.

*Town of Norwood, Mass. v. FERC,* 962 F.2d 20, 22 (D.C.Cir.1992); *see also Electricity Consumers Resource Council v. FERC,* 747 F.2d 1511, 1513–14 (D.C.Cir.1984).

We begin with the crucial first step in FERC's own reasoning. In accepting the modified Pool Agreement, FERC reiterated its support for the objective of the WSPP: "to capture economic benefits which were not already covered under existing agreements." *Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,313 (citation and internal quotation marks omitted). To appreciate this statement, one must understand that the Pool provides a mechanism by which member utilities may seize opportunities to trade that would otherwise be uneconomical or difficult to identify. These opportunities vary constantly according to patterns of usage, equipment availability, and weather conditions. The continual communication of basic data among the member utilities enables them to take instant advantage of often short-lived opportunities. Thus, a utility experiencing an unexpected, short-term lull in demand may sell capacity to another experiencing an unexpected, short-term run on electricity. Moreover, such transactions may occur over substantial distances, involve multiple parties, and include various services. In February 1989, for example, the Pacific Northwest experienced an unusual, region-wide cold snap and needed to import power. Several WSPP members serving the region used the hub to locate and purchase excess power from other areas. These utilities told the SDG consultants that without the WSPP mechanism, they would have had to resort to expensive, emergency supply arrangements to meet the demands of their customers. *See* SDG Report at 3–2, 3–4.

The orders we review today exemplify FERC's determination to streamline its regulatory processes to keep pace with advances

in information technology. Ratemaking is a time-consuming process. Before the Commission accepted the Pool Agreement, as modified by its orders, the member utilities were required to secure FERC's acquiescence in each transaction they undertook. *Cf.* 16 U.S.C. § 824d(c) (requiring utilities to file schedules showing "all rates and charges for any transmission or sale subject to the jurisdiction of the Commission"); *id.* § 824d(d) (requiring that 60 days elapse before any filed rate is put into effect); *id.* § 824d(e) (permitting the Commission on its own initiative to postpone the effective date of new rates for up to five months while it investigates their "lawfulness"). Were they still obliged to petition FERC, or to wait 60 days, every time they wished to consummate a new transaction, they could not take advantage of a host of short-lived opportunities made available by advances in information technology.

By accepting the WSPP Agreement, FERC has approved one set of rate ceilings to apply to all sales of energy products and another for all sales of transmission services. *Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,321–22. In effect, then, it has pre-approved countless trading arrangements, relying on market forces to keep most individual prices at reasonable levels. The only limitations on these arrangements are that the trades be short-term (lasting one year or less), *see id.* at 61,302, and that they be priced at or below the pre-set ceilings. Not surprisingly, "ease of contracting with new partners" was the aspect of the Pool cited as "most valuable" by a plurality of the WSPP utilities. *See* SDG Report at 3–3.

Petitioners complain, first, that FERC declined to order open access to transmission lines at cost-based rates to spur competition within the WSPP. The Exhibit C principles that FERC rejected constituted a pledge by WSPP members to employ specified "building blocks" in reaching bilateral or multilateral transmission agreements. Because WSPP membership is available to all qualifying utilities, Exhibit C represented a giant step toward the conversion of private transmission facilities into common carriers. Not surprisingly, the WSPP filing emphasized repeatedly the unwillingness of its members to go any further than Exhibit C in guaranteeing open access to transmission lines.

On determining that Exhibit C did not go far enough, FERC declined to condition its approval of the WSPP on the WSPP members' agreement to extend it still farther because it was satisfied that the members would not do so. *Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,320–21. By demanding that the WSPP approval be conditioned on still more stringent access requirements, petitioners would have FERC wager the Pool's proven efficiencies in a gamble to create an even better market. Given the WSPP's unquestioned benefits and the evidence that stronger transmission commitments could not be obtained, we do not find FERC's refusal to accede either arbitrary or unreasonable.

Petitioners' second and more substantial contention is that FERC acted arbitrarily by choosing a system of pricing flexibility over one fixed by regulation on a company-by-company, product-by-product basis. FERC offered three reasons for choosing pricing flexibility over greater pricing regulation. First, FERC invoked the "administrative benefits" of flexible pricing. *Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,718. The Commission described the "umbrella nature" of the WSPP agreement as an element "essential" to its success. *Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,321. It pointed to SDG's findings regarding "ease of contracting with new partners," which was named by a plurality of the WSPP membership as the "most valuable" aspect of the arrangement. *See id.* at 61,313 (citing SDG Report at 3–3, 3–5 to 3–6). And it specifically declined to order product-specific pricing, saying it wanted to allow participants the flexibility to buy and sell services with varying characteristics. *Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,718.

Although FERC did not expand further on these themes, we think its meaning is apparent. The administrative work involved in establishing and adhering to product- and company-specific rates is both extensive and expensive; thus, it would constitute a disincentive both to joining and to using the Pool.

And this expense, significant in any case, could be redoubled here. Petitioners have asked FERC not only to establish cost-based rates, but also to scrutinize costs to ensure that the approved rates reflect only that share of actual costs that was "prudently" incurred. It is true, of course, that the company- and product-specific rates petitioners advocate would be pre-approved, and thus that they would retain some of the benefits of the scheme approved by FERC. Still, the administrative burdens of establishing and implementing petitioners' complicated rate structure would be substantial. *Cf. Southwest Experiment,* 25 F.E.R.C. ¶ 61,469, at 62,046 ("Anything that simplifies [purchase and sales] decisions is likely to produce more trade among the participants.").

Second, FERC noted that it had been its "consistent practice, in evaluating ceilings to be used to price transactions that will occur from time to time without Commission review," to adopt cost-based uniform ceilings applicable to all services, whether firm or nonfirm. *Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,717–18. In this manner, utilities would have "the greatest flexibility ... to negotiate prices that reflect the service characteristics that will vary from time to time," while capping prices at reasonable levels. *Id.* at 62,718. It also noted that this policy was based on the presumption "that differences in the quality of the service will, in fact, be reflected in the discount below the ceiling offered by the supplier, i.e., nonfirm services will be offered at prices lower than firm services," adding that if this presumption were not vindicated in practice, interested parties could register their complaints with the Commission under section 206 of the Federal Power Act, 16 U.S.C. § 824e. *Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,-718. FERC admitted that the Pool ceilings were a compromise, but it found them reasonable because they were based on the average fixed costs of the facilities used by the WSPP members in providing their services. *See id.*

This approach to price regulation may have reflected a fear on FERC's part that the more rigid approach to pricing urged by petitioners would have robbed the pooling arrangement of much of its efficiency. In its analysis of the Southwest Bulk Power Experiment, FERC recognized that regulation by product can sometimes distort the marketplace, as trades are structured to take advantage of higher price ceilings rather than to meet the needs of utilities. *Cf. Southwest Experiment,* 25 F.E.R.C. ¶ 61,469, at 62,053. For instance, where prices are capped by product, and where demand for economy energy service outstrips supply, two utilities wishing to trade economy energy at higher-than-ceiling prices might agree to trade power on a firm basis instead, just to take advantage of the higher price cap that would apply to such a trade. Under a product-specific pricing regime, then, trades may occur either because the parties wish to purchase and sell the product involved, or because they wish to avail themselves of that product's price ceiling. Where trade occurs for the latter reason, the regulatory regime, not the needs of the utilities involved, has determined what product was traded; and one may rightly say that the pattern of trading in the market has been distorted by regulation.

Finally, FERC feared that stricter regulation would foreclose transaction opportunities, reducing the efficiency savings to be realized through the WSPP. *See generally Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,321–22 (paying careful attention to the share of transactions occurring under the experimental rates that would be forbidden by the lower rates approved for the permanent pool); *see also Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,718. Because WSPP transactions are consummated between willing and informed buyers and sellers, one may assume that transactions within the Pool promote efficiency. Buyers presumably buy from others only when doing so is less costly than the alternative, such as generating the extra power themselves. Therefore, in the absence of monopoly power, price ceilings will impinge on efficiency by forbidding sales that can occur only at higher-than-ceiling rates. Because the more restrictive pricing policy favored by petitioners would effect a net reduction in FERC-ordered rate ceilings, which are currently based on the cost of the most valuable product traded, firm energy, the adoption of product-based rates could

only diminish the effectiveness achieved by WSPP.

Similarly, company-specific ceilings, while they would be higher in some cases and lower in others, would also be likely to decrease efficiency. FERC found that the steep cuts it ordered in the experimental Pool-wide rate ceilings (about 38 percent for firm transmission and approximately 46 to 66 percent for firm energy) would reduce transaction volumes for both energy and transmission services by approximately ten percent. *See Acceptance Order*, 55 F.E.R.C. ¶ 61,099, at 61,321–22; *Clarification Order*, 55 F.E.R.C. ¶ 61,495, at 62,718–19. · It appears from this that transactions occur most frequently toward the low end of the currently permissible price range. If so, then lowering the current ceilings for low-cost companies could be expected to foreclose many more transactions than raising the ceilings for high-cost companies would allow.

Petitioners' complaint, in essence, is that FERC struck the wrong balance between promoting efficiency and ensuring that efficiency gains are widely distributed. They do not dispute that the regulation they seek could compromise overall efficiency through greater administrative burdens, distorted trading patterns, and foreclosed transaction opportunities. Rather, they argue that such regulation, even with its attendant losses, is needed to prevent monopoly returns from being reaped in certain transactions. FERC allowed a large degree of pricing flexibility, while forbidding trades above rates that it thought unreasonable in most circumstances. It ordered disclosure of all transaction prices, *see Clarification Order*, 55 F.E.R.C. ¶ 61,495, at 62,718, 62,720, thus putting WSPP members on notice that their transactions would be monitored. At the same time, it reminded the participating utilities that in the event of any abuses of the latitude allowed them, the Commission and interested parties could seek redress under section 206. *Id.* at 62,-716–17, 62,718. In sum, FERC sought to preserve the Pool's efficiencies even as it guarded against price gouging. On the facts in evidence, we find no basis for concluding it acted unreasonably.

### b. Discriminatory Rates

The FPA forbids public utilities from "maintain[ing] any unreasonable difference in rates ... either as between localities or as between classes of service." 16 U.S.C. § 824d(b). Petitioners argue that flexible pricing will lead to unreasonable price differences at the expense of utilities that are dependent on a single entity for access to the national electrical grid. Again, we disagree.

In previous cases, we have upheld the Commission in outlawing pool rates that would inevitably impose disproportionate burdens on certain utilities. *Municipalities of Groton v. FERC*, 587 F.2d 1296, 1302–03 (D.C.Cir.1978). We have also overturned the Commission where a rate design on its face produced discriminatory cross-subsidizations of some customers by others. *Electricity Consumers Resource Council v. FERC*, 747 F.2d at 1515–16. What is alleged here, however, is not discrimination that "seems clear from the [rate's] formulation," *see Groton*, 587 F.2d at 1303, but potential discrimination made possible by pricing flexibility. Under like circumstances in the context of natural gas regulation, we have recognized FERC's authority to police potential price discrimination through broad monitoring and individualized enforcement, so long as doing so does not "carr[y] such a risk of allowing undue discrimination or preferences as to be arbitrary and capricious." *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1009 (D.C.Cir.1987). Because the relevant provisions of the Federal Power and Natural Gas Acts are "substantially identical," we apply the same standards here. *See FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353, 76 S.Ct. 368, 371–72, 100 L.Ed. 388 (1956).

The factors bearing on FERC's willingness to accept a certain risk of price discrimination are akin to those supporting its finding that the price ceilings are just and reasonable. FERC apparently accepted SDG's conclusion that only the most disadvantageously positioned of the transmission-dependent utilities (the so-called "captives") would be significantly affected by any abuses of market power. *See Acceptance Order*, 55 F.E.R.C. ¶ 61,099, at 61,316; SDG Report at 5–9 to 5–10. This group consisted of only

five of the 40 WSPP members. *Acceptance Order*, 55 F.E.R.C. ¶ 61,099, at 61,336–37 (Commissioner Trabandt, dissenting); *see also* SDG Report at D–6. FERC also noted that the transaction reporting requirements would make it easier for any victim of discriminatory pricing to seek relief under section 206 of the FPA. *Clarification Order*, 55 F.E.R.C. ¶ 61,495, at 62,716–17, 62,718.

We acknowledge that the flexible pricing that fosters trading among the members of the Pool also permits price discrimination, especially against captive utilities. Yet given the benefits of this trading, the limited number of captive members, and the provisions for monitoring transactions and remedying any abuses of market power, we do not find that the Commission acted arbitrarily when it approved the use of flexible prices, despite their admitted risks.

### c. Departure from Commission Precedent

■ Petitioners also contend that the Commission's approval of the Pool Agreement constitutes a departure from precedent. They argue that FERC's prior decisions require it either to permit competition coupled with assured transmission access or to regulate prices on a company-specific, product-specific basis. We again disagree.

Petitioners rely, first, on various cases rejecting market-pricing proposals because of the presence of market power. *See Southwest Experiment*, 25 F.E.R.C. ¶ 61,469 (1983); *see also Public Service Co. of Indiana*, 51 F.E.R.C. ¶ 61,367, 1990 WL 488877 (1990) (*"PSI"*); *Pacific Gas & Electric Co.*, 42 F.E.R.C. ¶ 61,406 (1988) (*"Turlock"*). Yet, while FERC has indeed used transmission access and cost-based regulation as antidotes to specific instances of market power, *see PSI*, 51 F.E.R.C. ¶ 61,367, at 62,198–99; *Turlock*, 42 F.E.R.C. ¶ 61,406, at 62,197, it has never bound itself to a rule requiring either rigid regulation or textbook markets. Rather, it has asserted "substantial freedom to move away from cost-based ratemaking in appropriate circumstances." *Southwest Experiment*, 25 F.E.R.C. ¶ 61,469, at 62,060 (departing from cost-based ratemaking allowed where vital policy objective is served, consumers' interests are not need-

lessly jeopardized, and divergence is no more than necessary).

In the present case, FERC held that it had authority to depart from cost-based rates when

(1) changing characteristics of the industry justify a new approach; (2) deviations are not unreasonable or inconsistent with statutory responsibilities; and (3) the regulatory scheme acts as a monitor to determine whether competition will drive prices to a zone of reasonableness or to check rates if it does not.

*Acceptance Order*, 55 F.E.R.C. ¶ 61,099, at 61,314. This understanding—that rates need not be linked to costs in order to be just and reasonable—is far closer to FERC's traditional practice than the competition-or-regulation dichotomy urged on us by petitioners.

■ Next, they complain that FERC did not adequately explain its refusal to either require transmission access or impose stricter regulation. For support, they invoke *Hall v. McLaughlin*, 864 F.2d 868 (D.C.Cir.1989), in which we observed that "[r]easoned decisionmaking requires treating like cases alike," and that "[d]ivergence from agency precedent demands an explanation." *Id.* at 872. Those statements, however, must be placed in context. In *Hall*, we went on to explain that "[w]here the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing." *Id.* Further, where "the circumstances of the prior cases were sufficiently different than those of the case before us[,] ... the Commission was justified in declining to follow them," and the court could accept even a "laconic explanation as an 'ample' articulation of its reasoning." *Id.* at 873 (citing *United Municipal Distributors Group v. FERC*, 732 F.2d 202, 211 (D.C.Cir.1984)). We concluded "that if the court itself finds the past decisions to involve materially different situations, the agency's burden of explanation about any alleged 'departures' is considerably less." *Id.* Our rule, therefore, is that FERC may distinguish precedent simply by emphasizing the importance of considerations not previously contemplated, and that in so doing it

**412**

need not refer to the cases being distinguished by name.

Each of the decisions appealed to by petitioners is readily distinguishable under the standard of *Hall.* Petitioners make much of the fact that *Southwest Experiment* held specifically that transmission access was a precondition for FERC approval of the Southwest Bulk Power Experiment, *see Southwest Experiment,* 25 F.E.R.C. ¶ 61,469, at 62,045–47. That condition, however, was applied to an experimental six-member power pool in which prices were capped at twice average costs, and where the parties had volunteered transmission access. *See id.* at 62,029–30. Nothing in *Southwest Experiment* suggests like preconditions must be applied where the arrangement is not experimental, is open to all comers, calls for ceilings set at average cost, promises substantial consumer benefits, is subject to continuing monitoring for abuse, and might collapse if open access were ordered. Similarly, petitioners maintain that agency precedent precludes approval of a single ceiling for both firm and nonfirm services. The cases cited in support of this proposition are again readily distinguishable. They all involve actual rates, not rate ceilings. *See Central Maine Power Co.,* 54 F.E.R.C. ¶ 61,206, at 61,612 (1991), *remanded, Maine Public Serv. Co. v. FERC,* 964 F.2d 5, 9 (D.C.Cir.1992); *New England Power Co.,* 49 F.E.R.C. ¶ 61,129, at 61,554–55 (1989); *see also Florida Power & Light Co.,* 33 F.E.R.C. ¶ 61,116, at 61,247–48 (1985) (discussing degree to which fixed costs may be recovered through firm and nonfirm sales); *Wisconsin Public Serv. Corp.,* 22 F.E.R.C. ¶ 63,088, at 65,308–09 (A.L.J.1983) (holding that "interruptible service should not be treated for purposes of cost allocation as firm service"), *aff'd in relevant part,* 25 F.E.R.C. ¶ 61,101, at 61,323–25 (1983). In sum, the circumstances here differ too significantly from the precedent on which petitioners rely for us to invalidate FERC's orders on the authority of *Hall.* Although reasoned decisionmaking indeed requires "treating like cases alike," this principle cannot undermine the rulings we review today.

### 2. *The* Appalachian *Formula*

■ Petitioners argue that FERC improperly set rates according to the ratemaking approach adopted in *Appalachian Power Co.,* 39 F.E.R.C. ¶ 61,296, at 61,965–66 (1987). Under the particular variant of the *Appalachian* approach adopted here, one day's fixed costs are allocated pro rata over sixteen "peak" hours rather than twenty-four; one week's fixed costs are allocated over five days rather than seven; and, to avoid excessive contributions to fixed costs by customers using more than sixteen hours a day or five days a week of service, caps are established to preclude recovery of more than the appropriate daily or weekly total. *See Acceptance Order,* 55 F.E.R.C. ¶ 61,099, at 61,321 n. 82; *Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,717. FERC adopted this methodology because it deemed sales of services during off-peak hours or on weekend days "unlikely" and sought to allow full recovery of fixed costs through peak-hour and peak-day sales alone. *Clarification Order,* 55 F.E.R.C. ¶ 61,495, at 62,717.

Petitioners recite a litany of objections; among them, the absence of evidence as to how many transactions will take place off-peak, the inappropriateness of the formula to situations involving market power, and the denial of an adequate opportunity to test the methodology through cross-examination. We infer from this that petitioners favor ceilings set by prorating costs over all hours in a year, not just weekday peak hours. As noted before, we review the technical aspects of rate designs deferentially, and we approve them so long as they represent reasoned decisionmaking supported by substantial evidence. *Town of Norwood,* 962 F.2d at 22.

Petitioners' first objection is that better evidence of the difficulty of making off-peak-only sales is needed before FERC may calculate its ceilings according to the *Appalachian* formula. In response, FERC noted that the Pool was instituted to coordinate transactions in surplus energy, and that it had determined, from the WSPP membership and its own experience, that it was unlikely that suppliers of surplus energy could find customers for hourly service only during off-peak periods. *Clarification Order,* 55

F.E.R.C. ¶ 61,495, at 62,717. Accordingly, its hourly rate ceilings were designed to enable a supplier to earn a full contribution to its fixed cost for sixteen hours of service, relying on the cap on daily charges to prevent them from recovering more than those costs. *Id.* It is true that FERC did not cite hard data demonstrating that buyers are apt to buy hourly service only during on-peak hours or daily service only on weekdays. But given the patent reasonableness of FERC's assumptions about patterns of use, the representations of the Pool participants, and FERC's own expertise, we find that more exacting evidence of usage patterns was not required.

Petitioners' second objection is that the *Appalachian* rates are inappropriate for situations involving market power. By approving the overall rate ceilings, FERC assumed that competitive forces, not market power, would determine most transaction prices, and that legal prohibitions on discriminatory rates, *see* 16 U.S.C. 824d(b) (forbidding "undue preference[s]" and "unreasonable difference[s] in rates"), would serve to extend competitive pricing to situations where market power might otherwise prevail. *See Clarification Order*, 55 F.E.R.C. ¶ 61,495, at 62,718 (noting that WSPP members may request FERC review of rates that they believe to be "unduly discriminatory"). For the reasons discussed earlier, we see nothing unreasonable in this approach and these assumptions—and certainly nothing so unreasonable as to warrant our intrusion into the technical details of rate design. *See Town of Norwood*, 962 F.2d at 22.

■ Finally, petitioners object to FERC's adoption of the *Appalachian* approach without hearings providing an opportunity for cross-examination. FERC, however, is required to hold hearings only when the disputed issues may not be resolved through an examination of written submissions. *Boston Carrier, Inc. v. ICC*, 728 F.2d 1508, 1511 n. 5 (D.C.Cir.1984); *see also Cities of Carlisle & Neola, Iowa v. FERC*, 741 F.2d 429, 431 (D.C.Cir.1984) (approving "paper hearing[s]" in FERC cases). As the issues here appear capable of resolution without formal hearings, this challenge must also fail.

### 3. *Other Claims*

Petitioners raise a variety of additional complaints, all but one of which we are barred from considering. Congress has commanded that "[n]o objection to the order of the Commission shall be considered by the [reviewing] court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 16 U.S.C. § 825*l* (b) (1988); *cf. Rhode Island Consumers' Council v. FPC*, 504 F.2d 203, 212 (D.C.Cir.1974) (analogous provision of the Natural Gas Act is designed to give FERC an opportunity to "deal with" claims in the first instance).

Having read petitioners' request for rehearing carefully, we find that the only remaining objection properly before us is the claim that FERC improperly declined to schedule hearings to determine cost-based, utility-specific rates. We uphold its refusal to schedule the requested proceedings. Because the Commission was not required to set utility-specific rates, it was under no obligation to gather the data on which to do so.

### III. CONCLUSION

In view of the foregoing, the petitions for review of FERC's decision are

*Denied.*