LOMAK PETROLEUM,
INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Norse Pipeline, LLC and Columbia Gas
Transmission Corporation,
Intervenors.

No. 99–1113.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 29, 2000.

Decided March 28, 2000.

---

Joseph D. Lonardo argued the cause for petitioner. With him on the briefs was John W. Wilmer, Jr.

Judith A. Albert, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were John H. Conway, Acting Solicitor, and Susan J. Court, Acting Deputy Solicitor. Jay L. Witkin, Solicitor at the

time the brief was filed, entered an appearance.

Frederic J. George, Robin Nuschler, Randall S. Rich and S. Dennis Holbrook were on the brief of intervenors Columbia Gas Transmission Corporation and Norse Pipeline, LLC. Betsy R. Carr entered an appearance.

Before: EDWARDS, Chief Judge, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

In May 1998, Columbia Gas Transmission Corporation requested authorization from the Federal Energy Regulatory Commission (FERC) to abandon, by sale to Norse Pipeline, LLC, Columbia's "Project Penny" facilities.[1] At the same time, Norse asked FERC to disclaim jurisdiction over the Project Penny facilities once Columbia conveyed them, on the ground that they would then constitute facilities used for the "gathering" of natural gas. Such facilities are exempt from FERC jurisdiction under section 1(b) of the Natural Gas Act (NGA), 15 U.S.C. § 717(b). On November 4, 1998, FERC acceded to both requests. *See Columbia Gas Transmission Corp.*, 85 F.E.R.C. ¶ 61,191 (1998).

FERC's order pleased Columbia and Norse, but displeased petitioner Lomak Petroleum, Inc., a gas producer that transports· gas on the Project Penny system. Lomak sought rehearing, reasserting challenges both to the abandonment and to the disclaimer of jurisdiction. After FERC denied rehearing, *see Columbia Gas Transmission Corp.*, 86 F.E.R.C. ¶ 61,137

(1999), Lomak petitioned this court to review the decision to disclaim jurisdiction. Lomak contends that FERC's determination that the Project Penny facilities primarily perform a gathering function was arbitrary and capricious, inconsistent with a preexisting settlement agreement, and made without affording Lomak due process.

I

The Project Penny facilities are located in western New York and northwestern Pennsylvania. They are composed of approximately 336 miles of 2- to 12-inch diameter pipeline, seven compressor stations, and other related facilities, all of which were the subject of certificates of public convenience and necessity issued by FERC during the period of Columbia's ownership. *See* 85 F.E.R.C. at 61,765. Columbia, a natural gas company engaged in the business of transporting natural gas in interstate commerce, constructed the facilities in the 1970s and 1980s to access Appalachian gas supplies for its customers. Because the facilities were not on its system, Columbia initially entered into third-party transportation and exchange agreements with other companies to bring the New York and Pennsylvania gas to market. Columbia intended to connect the Project Penny facilities to its main line, but before the connections were constructed the Commission implemented its major open-access orders, Order No. 436 and Order No. 636.[2] *See id.* As a consequence, Columbia became a transporter rather than a merchant of natural gas and no longer needed to operate Project Penny to access system supplies. *See id.*

---

1. Section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b), prohibits a natural gas company from abandoning any portion of its jurisdictional facilities without FERC approval.

2. *See* Order No. 436, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, FERC Stats. & Regs. ¶ 30,665 (1985); Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regula-

tion of Natural Gas Pipelines After Partial Wellhead Decontrol, FERC Stats. & Regs. ¶ 30,939 (1992). Prior to these orders, pipelines like Columbia provided bundled sales services, wherein the costs of all facilities to move gas from the wellhead to the customer were reflected in the pipeline's sales rates. Order 636 required the unbundling of services including gathering. *See Conoco Inc. v. FERC*, 90 F.3d 536, 540–41 (D.C.Cir.1996). *See generally United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C.Cir.1996).

In 1998, Columbia sought authorization to sell the Project Penny facilities to Norse. The latter is not a natural gas company, owns no facilities that come within FERC's jurisdiction, and provides no jurisdictional services. *See id.* at 61,-769. Norse operates exclusively in New York as the owner of discrete gathering facilities. *See id.* FERC determined that after Norse acquired the Project Penny facilities, it would continue to own exclusively gathering facilities, exempt from FERC jurisdiction under the NGA. *See* 86 F.E.R.C. at 61,486, 85 F.E.R.C. at 61,-679.

## II

Lomak's first contention is that FERC arbitrarily and capriciously determined that after Norse's acquisition,the primary function of the Project Penny facilities would be the jurisdictionally-exempt gathering, rather than the jurisdictionally-covered transmission, of natural gas.

The NGA grants FERC jurisdiction over (inter alia) the transportation of natural gas in interstate commerce, but exempts from FERC's jurisdiction the production and gathering of natural gas. *See* 15 U.S.C. § 717(b). The term "gathering" is not defined in the NGA, but has been defined by the Commission as "the collecting of gas from various wells and bringing it by separate and several individual lines to a central point where it is delivered into a single line." *Barnes Transp. Co.,* 18 F.P.C. 369, 372 (1957); *see Northern Natural Gas Co. v. State Corp. Comm'n,* 372 U.S. 84, 90, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963) (stating that "production" and "gathering" are terms "narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution"). As we have previously remarked, "[t]he line between jurisdictional transportation and nonjurisdictional gathering is not always clear." *Conoco Inc. v. FERC,* 90 F.3d 536, 542 (D.C.Cir.1996).

Since 1982, FERC has used the "primary function" test to determine "whether a facility is devoted to the collection of gas from wells—gathering—or to the further ('downstream') long-distance movement of gas after it has been collected—interstate transportation." *Id.* at 543. That test generally employs the following six physical criteria:

(1) the length and diameters of the lines; (2) the extension of the facility beyond the central point in the field; (3) the geographic configuration of the facility; (4) the location of compressors and processing plants; (5) the location of wells along all or part of the line facility; and (6) the operating pressure of the lines.

85 F.E.R.C. at 61,768 (citing *Farmland Indus., Inc.,* 23 F.E.R.C. ¶ 61,063 (1983), and *Amerada Hess Corp.,* 52 F.E.R.C. ¶ 61,268 (1990)). In addition, FERC considers the following "non-physical" criteria:

(1) the purpose, location and operation of the facility; (2) the general business activity of the owner of the facility; (3) whether a jurisdictional determination, i.e., gathering versus transmission, is consistent with the objectives of the NGA and the Natural Gas Policy Act (NGPA); and (4) the changing technical and geographic nature of exploration and production activities.

*Id.* (citing *Amerada Hess,* 52 F.E.R.C. at 61,844–45). No one factor is determinative in the primary function test, and not all factors apply in all situations. *See Williams Field Servs. Group, Inc. v. FERC,* 194 F.3d 110, 116 (D.C.Cir.1999); *Conoco,* 90 F.3d at 543. The Commission "gives consideration to all of the facts and circumstances of the case rather than mechanically applying a facilities configuration standard." *West Tex. Gathering Co.,* 45 F.E.R.C. ¶ 61,386, at 62,219 n. 4 (1988); *see also Conoco,* 90 F.3d at 543.

■ Lomak agrees that the primary function test is appropriate for determining whether a facility engages in gathering, but contends that FERC's application of the test to Project Penny was arbitrary and capricious. As we have previously held, "[i]n evaluating and balancing the

several factors under the primary function test, the Commission brings to bear its considerable expertise about the natural gas industry." *Conoco*, 90 F.3d at 544. Accordingly, we will uphold the Commission's application of the test as long as it gives "reasoned consideration to each of the pertinent factors" and articulates factual conclusions that are supported by substantial evidence in the record. *Id.*; *see* 15 U.S.C. § 717r(b) ("The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."); *Williams Field Servs.*, 194 F.3d at 115.

■ Lomak contends that while purporting to apply the primary function test, FERC in fact employed a "pipeline-always-wins" test. Lomak Br. at 14. We see no sign of such duplicity here.[3] In the challenged orders, FERC set forth the primary function test's factors and, after analysis, concluded that four of the physical factors indicated that the Project Penny facilities were primarily engaged in "gathering." It found that the mostly small diameters and short lengths of the project's lines were consistent with the conclusion that Project Penny serves to gather gas from wells for delivery to a jurisdictional transportation system. The Commission noted that there was no processing plant on the system; that the lines formed a web-like geographic configuration, with the longer lines forming backbones that collect gas from feeding lines along their lengths; and that the low wellhead and pipeline pressures were consistent with gathering rather than transmission. In the past, FERC has relied on these same factors to determine that a system primarily performs a gathering function. *See, e.g., NorAm Gas Transmission Co.*, 75 F.E.R.C. ¶ 61,127, at 61,429–30 (1996) (citing small diameters, low pipeline pressures and web-like configuration);

*Arkla Gathering Servs. Co.*, 67 F.E.R.C. ¶ 61,257, at 61,868–69 (1994) (noting short length, small-diameter pipelines, web-like configuration, and that there were "no gathering facilities downstream of any processing plants"); *Panhandle E. Pipe Line Co.*, 59 F.E.R.C. ¶ 61,108, at 61,405–06 (1992) (citing small diameter lines and "network of small lines appending an array of wells"); *Dorchester Gas Producing Co.*, 32 F.E.R.C. ¶ 61,409, at 61,917 (1985) (noting geographic configuration, location "behind the processing plant,'' and small diameter lines).

In making its findings regarding Project Penny, FERC further relied on one of the primary function test's nonphysical factors: "the general business activity of the owner of the facility." FERC emphasized that, unlike Columbia, Norse operates only gathering facilities, "is not a natural gas company," provides no transmission services, and is not affiliated with a jurisdictional pipeline. *See* 86 F.E.R.C. at 61,486, 85 F.E.R.C. at 61,769. FERC further noted that the Project Penny facilities do not deliver gas off the system to city or farm taps. *See* 86 F.E.R.C. at 61,486–87. Rather, "[t]he lines gather gas produced from local wells and transport it directly to the interstate lines of Tennessee Gas Pipeline Company," an unaffiliated entity. *Id.* at 61,487. These, too, appear to be reasonable indices that Project Penny is primarily a gathering rather than transmission facility.

Lomak contends that FERC's resolution of this case is inconsistent with its determinations in others, where it classified facilities as primarily performing a transmission function despite the presence of some of the same factors relied upon here. Lomak's effort to focus on the presence or absence of specific factors in individual cases is not persuasive, however, in the

---

3. Lomak's contention that pipelines have prevailed in a large majority of the cases in which FERC has applied the primary function test does not prove the company's thesis. Without evaluating the merits of each of those cases, we cannot determine whether their dispositions were justified. Nor can we evaluate

the merits of those cases here, as none of the relevant evidence is before us. All we have is the record of the Project Penny decision and, as discussed below, it is a record that justifies the result reached by the Commission with respect to that facility.

context of an explicitly multifactor test which necessarily involves a balancing of those factors that are present and those that are not. Moreover, FERC has reasonably distinguished the cases Lomak cites for support. For example, although Lomak contends that FERC has found that small diameter pipelines can perform transmission functions, FERC notes that in those cases, "other indicia of gathering, such as wells and/or feeder lines along their length, were absent." 85 F.E.R.C. at 61,768 n. 20. Lomak specifically observes that FERC classified Columbia's Miley facility, which utilized 8–, 10–, and 12–inch pipe, as a transmission facility. But as FERC notes, unlike Project Penny, the Miley facility was "located between jurisdictional compressor stations [and] used primarily to balance transmission loads, maximize throughput, and provide storage services." *Columbia Gas Transmission Corp.*, 86 F.E.R.C. ¶ 61,223, at 61,799–800 (1999); *see* FERC Br. at 24.[4]

"[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *San Luis Obispo Mothers For Peace v. United States Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C.Cir.1986) (en banc). Lomak has failed to establish convincing inconsistencies between FERC's treatment of Project Penny and other facilities, and has offered no affirmative evidence supporting its contention that the Project Penny facilities are primarily engaged in transmission. Accordingly, Lomak has not met its burden, and we reject its first challenge to FERC's orders.

### III

■ Lomak's second claim is that FERC's determination regarding Project

Penny conflicts with a settlement agreement approved by the agency in a separate proceeding. *See Columbia Gas Transmission Corp.*, 79 F.E.R.C. ¶ 61,044 (1997). As Lomak was not itself a party to that agreement, its interpretation of the agreement carries little weight. Moreover, "[b]ecause 'Congress explicitly delegated to FERC broad powers over ratemaking, including the power to analyze relevant contracts,' and because the Commission has greater technical expertise in this field than does the Court, we accord deference to the Commission's interpretation of . . . Settlement Agreement[s]." *Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 604 (D.C.Cir.1997) (quoting *Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 441–42 (D.C.Cir.1988)) (other citations omitted); *see Northern Mun. Distribs. Group v. FERC*, 165 F.3d 935, 943 (D.C.Cir.1999). "To be sure, we need not accept 'an agency interpretation that black means white. However, if the choice lies between dark grey and light grey, the conclusion of the agency, unmistakably possessed as it is of special expertise, in favor of one or the other will have great weight.'" *Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1576 (D.C.Cir.1993) (quoting *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1572 (D.C.Cir. 1987)).

The relevant portions of the settlement at issue here read as follows:

### ARTICLE I

### DISTANCE–SENSITIVE RATE ISSUE

The distance-sensitive rate issue . . . shall be settled for the periods described

---

4. Lomak also complains that although FERC noted that Project Penny lacks a processing plant, the Commission recently found that a facility with a processing plant can still perform a gathering function. *See Kentucky–West Va. Gas Co.*, No. CP99–321–000, 1999 WL 549651 (FERC July 29, 1999). Depending upon its location, the presence of a processing plant may be a factor indicating trans-

mission. *See Williams Field Servs.*, 194 F.3d at 116. Nevertheless, the fact that the *presence* of a processing plant may not disqualify a facility from being classified as gathering (where other factors typical of gathering exist) does not mean that the *absence* of a processing plant signals transmission or that the Commission is acting inconsistently.

below and upon the following terms and conditions:

A. Postage Stamp Rate Design.

. . . .

(2) In addition, *prior to April 1, 2002, neither Columbia, nor any party or other person shall raise or advocate any issue related to functionalization, classification, allocation or direct assignment of any Columbia facilities . . . so as to directly charge the costs of such facilities or associated costs to any individual customers served under a generally applicable rate schedule,* either (a) because of physical or operational differences . . . on different parts of Columbia's system . . . or (b) for any other reason. Nothing in this Stipulation shall prevent Columbia or any party from: (a) proposing or challenging the proposed rate and accounting treatment of a sale and/or transfer of facilities by Columbia. . . .

Settlement, Article I (emphasis added). Lomak contends that the sentence italicized above, which states in part that no party may raise "any issue related to functionalization," prohibits FERC from "refunctionalizing" the Project Penny facilities from transmission to gathering. FERC disagrees, stating that "[i]nstead of prohibiting refunctionalization, the above-referenced subparagraph precludes parties and others from departing from Columbia's rate design during the locked-in period of the settlement." 86 F.E.R.C. at 61,486.

We find FERC's reading of the sentence, as applying to rates rather than jurisdiction, to be reasonable. As the Commission noted, the sentence does not bar a party from raising "any issue related to the refunctionalization of any Columbia facilities" per se, but only from raising such an issue "so as to directly charge the costs of such facilities . . . to any individual customers served under a generally applicable rate schedule." *See id.* Indeed, the sentence is contained in an article entitled "Distance–Sensitive Rate Issue"; the introductory sentence of the article states that "the distance sensitive rate issue . . .

shall be settled . . . upon the following terms and conditions"; and the specific subheading in which the sentence is found is entitled "Postage Stamp Rate Design." Moreover, the sentence following that cited by Lomak states that "[n]othing in this Stipulation shall prevent Columbia or any party from: (a) proposing . . . rate and accounting treatment of a sale and/or transfer of facilities by Columbia," thus plainly contemplating that a sale like that at issue here might occur.

To protect Columbia's existing customers, the settlement does provide that "purchasers of Columbia's abandoned gathering facilities will continue to provide gathering service for two years on a non-discriminatory open-access basis at rates not to exceed the applicable maximum rates shown on Appendix F of the settlement." 86 F.E.R.C. at 61,486. But Norse agreed to assume that obligation, and FERC concluded that "Norse's agreement to hold rates steady in accordance with the settlement agreement is sufficient to address Lomak's concerns about a potential rapid increase in gathering rates." *Id.* Because FERC reasonably interpreted the settlement as posing no impediment to the *jurisdictional* reclassification of the Project Penny facilities, we reject Lomak's second attack on FERC's orders.

**IV**

■ Lomak's final contention is that FERC deprived it of due process by failing to hold a technical conference before concluding that the Project Penny facilities primarily involved gathering. This court "has repeatedly held that the Commission 'is required to hold hearings only when the disputed issues may not be resolved through an examination of written submissions.'" *Conoco,* 90 F.3d at 543 n. 15 (quoting *Environmental Action v. FERC,* 996 F.2d 401, 413 (D.C.Cir.1993)). In its initial order, FERC denied Lomak's request for a technical conference, finding "the record to be complete and no issues of

material fact which cannot be resolved on the record." 85 F.E.R.C. at 61,767 n. 11. In its order denying rehearing, the Commission again concluded that a technical conference was unnecessary because "[t]here are no material issues of fact in dispute which cannot be resolved on the basis of the existing record." 86 F.E.R.C. at 61,485.

Lomak's briefs make only two, vague references to the kind of information it wished to present at a technical conference. First, Lomak states that such a conference would have given it the opportunity "to demonstrate the devastating effect" Norse's rates would have on Lomak after the two-year transition period ended. Lomak Br. at 8. Yet, while such evidence might arguably be relevant to the question of whether Columbia should have been permitted to abandon the Project Penny facilities, Lomak has not challenged abandonment on this appeal. Rather, its challenge is to FERC's decision to "relinquish" jurisdiction on the ground that the facilities primarily involve gathering. See Lomak Br. at 2 (statement of issues presented). Economic impact, however, is not one of the factors in the primary function test for FERC jurisdiction. More important, even if economic impact were relevant, Lomak offers no reason why evidence of such impact could not have been submitted in written form.

Second, Lomak contends in a footnote that: "One of the reasons a Technical Conference was requested was the fact that production associated with the Project Penny system is classified as Appalachian Basin production and, as such, has unique characteristics unlike those found in any other gas producing region of the country." Lomak Br. at 21 n.34. But at oral argument, Lomak conceded that FERC is familiar with the unique attributes of the Appalachian region,[5] and offered no specifics as to which it wished to enlighten the agency. Nor did Lomak give any reason why it could not have adequately depicted those unique attributes in a written submission. We therefore find no error in FERC's decision to dispense with a technical conference. See Woolen Mill Assocs. v. FERC, 917 F.2d 589, 592 (D.C.Cir.1990) ("[M]ere allegations of disputed fact are insufficient to mandate a hearing; a petitioner must make an adequate proffer of evidence to support them.").

## V

For the foregoing reasons, we reject Lomak's challenges to FERC's orders and deny the company's petition for review.

---

**5.** See, e.g., National Fuel Gas Supply Corp., 71 F.E.R.C.¶61,031, at 61,138 (1995) (noting "the unique circumstances in the Appalachian region").