**EXXONMOBIL GAS MARKETING COMPANY, a Division of Exxon Mobil Corporation, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

ANR Pipeline Company,
et al., Intervenors.

Nos. 00–1355, 00–1357, 00–1361,
00–1363 through 00–1365.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 1, 2002.

Decided Aug. 6, 2002.

See also 127 F.3d 365.

Jon L. Brunenkant and Stephen L. Teichler argued the causes for petitioners

Amerada Hess Corporation, et al. With them on the briefs were David G. Stevenson, Frederick T. Kolb, Stanley P. Geurin, John P. Beall, Douglas W. Rasch, and Mickey J. Lawrence. Cheryl J. Walker entered an appearance.

James M. Costan argued the cause for petitioner Producer Coalition and intervenor Independent Petroleum Association of America. With him on the briefs were T. Alana Deere and David M. Sweet. Bruce W. Neely and John W. Wilmer, Jr., entered appearances.

Timm Abendroth, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Cynthia A. Marlette, Acting General Counsel, and Dennis Lane, Solicitor.

Brian D. O'Neill argued the cause for intervenors Sea Robin Pipeline Company and Williams Gas Processing–Gulf Coast Company. With him on the brief were David P. Sharo, Merlin E. Remmenga, James T. McManus, Joseph S. Koury and Mari M. Ramsey.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge EDWARDS.

SENTELLE, Circuit Judge:

ExxonMobil Gas Marketing Company, et al.,[1] (hereinafter "ExxonMobil") and the Producer Coalition[2] petition for review of

**1.** Joining ExxonMobil Gas Marketing Co.'s brief are: Amerada Hess Corp., Amoco Production Co., BP Energy Co., Anadarko Petroleum Corp., Marathon Oil Co., Murphy Exploration and Production Co., Phillips Petroleum Co., and Texaco Natural Gas, Inc.

**2.** The Producer Coalition consists of Forest Oil Corp., the Houston Exploration Co., Newfield Exploration Co., Ocean Energy, Inc., Dominion Exploration & Production, Inc., and TotalFinaElf E&P U.S.A., Inc. Intervenor Independent Petroleum Association of America joins the Producer Coalition's brief.

Federal Energy Regulatory Commission ("FERC" or "the Commission") orders in which FERC reclassified portions of Sea Robin Pipeline Company's pipeline system on the Outer Continental Shelf as non-jurisdictional "gathering" facilities for natural gas, rather than jurisdictional "transportation" facilities, pursuant to section 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b). FERC argues that in developing and applying its reformulated "primary function" test the Commission followed the suggestion of the United States Court of Appeals for the Fifth Circuit in *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365 (5th Cir.1997) (*"Sea Robin I"*), and reasonably identified the demarcation point between gathering and transportation in Sea Robin's pipeline system. Because the Commission did not act unreasonably in determining that portions of Sea Robin's system were non-jurisdictional, we deny the petitions for review.

## I. Background

### A. Statutory and Regulatory Framework

Section 1(b) of the Natural Gas Act ("the Act"), 15 U.S.C. § 717 *et seq.*, governs "the transportation of natural gas in interstate commerce." 15 U.S.C. § 717(b). However, in section 1(b) of the Act Congress prescribed not only "the intended reach of the Commission's power, but also specified the areas into which this power was *not* to extend." *Federal Power Comm'n v. Panhandle E. Pipe Line Co.*, 337 U.S. 498, 503, 69 S.Ct. 1251, 1255, 93 L.Ed. 1499 (1949) (emphasis added). Section 1(b) expressly exempts from the Commission's jurisdiction "the production or gathering of natural gas." 15 U.S.C. § 717(b). Thus, Congress "carefully divided," *Northwest Central Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 510, 109 S.Ct. 1262, 1274, 103 L.Ed.2d 509 (1989), energy regulatory authority and

"did not envisage federal regulation of the entire natural-gas field to the limit of constitutional power. Rather it contemplated the exercise of federal power as specified in the Act." *Panhandle Eastern*, 337 U.S. at 502–03, 69 S.Ct. at 1255.

The Natural Gas Act does not define either "transportation," which falls within the Commission's jurisdiction, or "gathering," which is exempt from FERC authority under the Act. The Supreme Court has, however, held that "[e]xceptions to the primary grant of jurisdiction in the section are to be strictly construed." *Interstate Natural Gas Co. v. Federal Power Comm'n*, 331 U.S. 682, 690–91, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947) (construing 15 U.S.C. § 717(b)). Thus, the Supreme Court has "consistently held that 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." *Northern Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 90, 83 S.Ct. 646, 649–50, 9 L.Ed.2d 601 (1963). The Commission's long-held definition of gathering, taken as consistent with the Supreme Court's pronouncements on the Act, is "the collecting of gas from various wells and bringing it by separate and several individual lines to a central point where it is delivered into a single line." *Barnes Transp. Co.*, 18 F.P.C. 369, 372 (1957); *see also Conoco Inc. v. FERC*, 90 F.3d 536, 539 n. 2 (D.C.Cir.1996) ("Gathering is the process of taking natural gas from the wells and moving it to a collection point for further movement through a pipeline's principal transmission system.") (citing *Northwest Pipeline Corp. v. FERC*, 905 F.2d 1403, 1404 n. 1 (10th Cir.1990)).

Despite these attempts to clarify the Natural Gas Act, this Court has observed that "[t]he line between jurisdictional transportation and nonjurisdictional

gathering is not always clear." *Conoco*, 90 F.3d at 542. For many years the Commission employed two principal tests to differentiate transportation from gathering. Developed in the on-shore context, these tests were the "behind-the-plant" test and the "central-point-in-the-field" test. The "behind-the-plant" test presumes that all facilities located between the wellhead and a processing plant are non-jurisdictional gathering lines, while facilities downstream of the processing plant are presumptively transportation facilities. *See Phillips Petroleum Co.*, 10 F.P.C. 246, 276–78, 1951 WL 1832 (1951), *rev'd on other grounds, Wisconsin v. Federal Power Comm'n*, 205 F.2d 706 (D.C.Cir.1953), *aff'd, Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). For gas that requires no processing the "central-point-in-the-field" test applied, under which lateral lines collecting gas from separate wells that then converge into a single larger line (typically at the point where the gas is compressed for transportation by the pipeline), were classified as gathering facilities. *E.g., Barnes Transp. Co.*, 18 F.P.C. 369, 372 (1957). Since 1983, the Commission has subsumed these two tests into its "primary function" test to determine "whether a facility is devoted to the collection of gas from wells—gathering—or to the further ('downstream') long-distance movement of gas after it has been collected—interstate transportation." *Conoco*, 90 F.3d at 543 (citing *Farmland Industries, Inc.*, 23 F.E.R.C. ¶ 61,063, at 61,143, 1983 WL 39391 (1983); *Amerada Hess Corp.*, 52 F.E.R.C. ¶ 61,268, at 61,987–88, 1990 WL 1241336 (1990)).

 The "primary function" test generally employs the following six physical criteria: (1) the length and diameters of the lines; (2) the extension of the facility beyond the central point in the field; (3) the geographic configuration of the facility; (4) the location of compressors and processing plants; (5) the location of wells along all or part of the line facility; and (6) the operating pressure of the lines. *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1196 (D.C.Cir.2000). In addition, FERC considers the following "non-physical" criteria: (1) the purpose, location and operation of the facility; (2) the general business activity of the owner of the facility; (3) whether a jurisdictional determination, i.e., gathering versus transmission, is consistent with the objectives of the Natural Gas Act and other legislation; and (4) the changing technical and geographic nature of exploration and production activities. *Id.* No one factor is determinative in the primary function test, and not all factors apply in all situations. *See Williams Field Servs. Group, Inc. v. FERC*, 194 F.3d 110, 116 (D.C.Cir.1999); *Conoco*, 90 F.3d at 543. The Commission "gives consideration to all of the facts and circumstances of the case rather than mechanically applying a facilities configuration standard." *West Tex. Gathering Co.*, 45 F.E.R.C. ¶ 61,386, at 62,219 n.4, 1988 WL 246728 (1988); *see also Conoco*, 90 F.3d at 543.

When these physical factors were developed, most jurisdictional questions involved onshore facilities. As an increasing number of facilities have been constructed offshore on the Outer Continental Shelf ("OCS"), where the pattern of gathering and distribution differs, the applicability of the factors has been questioned. *See, e.g., EP Operating Co. v. FERC*, 876 F.2d 46 (5th Cir.1989). Specifically, it is often not feasible to process raw gas on open water. As a result, pipelines on the OCS typically do not gather gas at a local, centralized point within a field as they would onshore, to prepare it for traditional transportation. Rather, on the OCS, relatively long lines are constructed to carry the raw gas from offshore platforms, where "[o]nly the most rudimentary separation and dehydration operations" are conducted, *EP Operating*,

876 F.2d at 47, to the shore or a point closer to shore, where it can be processed into "pipeline quality" gas. *Id.* at 48. In *EP Operating Co.*, the Fifth Circuit discounted FERC's ruling that the offshore platform where initial gas treatment took place constituted a "central point in the field" where the gathering function was complete, and reversed FERC's decision that the 51–mile long, 16–inch diameter OCS pipeline downstream of that platform was a jurisdictional transportation facility. *See id.* at 49. Following *EP Operating Co.*, FERC noted that "because of recent advances in engineering and available technology, offshore drilling operations continue to move further offshore and further from existing interstate pipeline interconnections" and therefore the Commission would assess "the continuing viability and relevance of the 'primary function' test to current industry conditions." *Amerada Hess*, 52 F.E.R.C. at 61,988. FERC then modified its primary function test to apply a sliding scale, "allow[ing for] the use of gathering pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the offshore production area," *id.* at 61,988, and to consider the "non-physical" criteria described above. This "modified" primary function test was applied by FERC when Sea Robin petitioned in 1995 for a declaration that its facilities perform a gathering function, rather than transportation, thus entitling Sea Robin to exemption from the Commission's jurisdiction under section 1(b) of the Act.

### B. Sea Robin's Pipeline System[3]

Sea Robin's pipeline system is located entirely offshore in the Gulf of Mexico and approximately 90 percent of its facilities lie in water depths of less than 140 feet. It is one of numerous competing pipeline sys-

tems located in the Gulf. The Sea Robin system is configured roughly in the form of an inverted "Y" with two arteries stretching roughly southwest and southeast from a central point about fifty miles south of the Louisiana coast. These two pipelines collect raw gas from sixty-seven offshore production platforms. Sea Robin's Vermilion 149 Compressor Station stands at the intersection of these two pipelines. It compresses the gas from the sixty-seven platforms for travel north, up the inclined seabed, to the Erath Compressor Station on the mainland. After collecting gas from four more platforms, the system terminates near Erath, Louisiana, where the gas is separated, dehydrated and processed. The Erath Compressor Station then prepares the gas for delivery to downstream transmission pipelines at five nearby entry points.

The Sea Robin system consists of 438 miles of dual-phase pipelines with a capacity to transport 1.26 billion cubic feet of gas per day (Bcf/day) and includes around 69,500 horsepower (hp) of compression. The pipeline is "dual-phase" in that it carries a raw stream of unpurified natural gas and liquid hydrocarbons taken directly from the gas wells. The total compression horsepower at the Vermilion 149 Station is37,050 hp and is 32,490 hp at Erath, Louisiana. Of the 438 miles of pipes, 339 miles are larger than twenty inches in diameter. The remaining ninety-nine miles of pipes, mostly running from individual platforms to the larger pipes, are between four and sixteen inches in diameter.

Along the two arms of the inverted "Y," which extend out in the Outer Continental Shelf, 45 lateral lines with diameters ranging from 4.5 to 30 inches are connected to 67 receipt points located on production

---

**3.** This discussion is largely taken from *Sea Robin I*, 127 F.3d at 367–68. *See also Sea Robin Pipeline Co.*, 87 F.E.R.C. ¶ 61,384, at 62,430, 1999 WL 444654 (1999).

platforms, or at subsea taps where Sea Robin's facilities intersect with short lateral lines of producers or pipelines. Through these upstream arms, Sea Robin moves the raw gas to the Vermilion 149 Station at the fork of the "Y," a manned platform with two turbine compressor units of 12,350 horsepower each. From there, the gas moves along the Vermilion 149–Erath segment. That segment is the longest portion of the pipeline, consisting of 66.3 miles of 36–inch diameter pipeline running in a straight line from Sea Robin's Vermilion compressor station to onshore processing facilities. Gas from four additional platforms is mingled with the gas traveling the Vermilion 149–Erath segment. The four platforms along this section are within twenty-five miles of the Vermilion compressor station, which means that the last forty-one miles of the thirty-six inch diameter pipeline are uninterrupted by lateral pipe segments. The gas and liquefiables delivered by Sea Robin meet the merchantable natural gas quality standards of downstream transmission pipelines.

FERC issued the original certificate for the Sea Robin system in 1969, pursuant to section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), authorizing the system to both sell and transport gas from the Outer Continental Shelf. *Sea Robin Pipeline Co.*, 41 F.P.C. 257, 1969 WL 5152 (1969). In later years the Commission certificated extensions of the Sea Robin system farther out on the OCS. *See Sea Robin Pipeline Co.*, 87 F.E.R.C. at 62,429 n. 26. Subsequently, Sea Robin became a transportation-only pipeline, and its shippers today consist of producers and marketers that transport gas onshore for ultimate delivery to markets on connecting interstate pipelines. *Id.* at 62,428.

### C. Prior Proceedings

In 1995, the Sea Robin Pipeline Company petitioned FERC for a declaration that its facilities perform a "gathering" function, rather than "transportation," and are thus not subject to the Commission's jurisdiction under section 1(b) of the Natural Gas Act. *See Sea Robin I*, 127 F.3d at 367. FERC denied Sea Robin's petition, determining that its pipelines were engaged in jurisdictional transportation activities. *See id.*; *Sea Robin Pipeline Co.*, 71 F.E.R.C. ¶ 61,351, 1995 WL 361806 (1995), *order denying reh'g*, 75 F.E.R.C. ¶ 61,332, 1996 WL 355518 (1996). In reaching its conclusion, FERC emphasized the *"very large size* of [Sea Robin's] system." *Sea Robin Pipeline Co.*, 71 F.E.R.C. at 62,398 (emphasis in original). According to the Commission, "the length and diameter of the system's components, as well as its overall size, [we]re not outweighed by other elements of the 'primary function' test." *Id.* Further, FERC "repeatedly emphasized that the non-physical criteria in its test supported its conclusion that Sea Robin was a transporter, particularly Sea Robin's prior certification as a jurisdictional pipeline and its ownership by an interstate pipeline." *Sea Robin I*, 127 F.3d at 369–70. Sea Robin petitioned for review of FERC's order in the U.S. Court of Appeals for the Fifth Circuit. The Fifth Circuit granted that petition for review, vacated the order, and remanded to the Commission. *Sea Robin I*, 127 F.3d at 372.

Specifically, the Fifth Circuit questioned FERC's reliance on the size of Sea Robin's system as "presumptively" determinative, as well as the apparent abandonment, without reasoned consideration, of the "sliding scale" approach announced by the Commission in *Amerada Hess*, 52 F.E.R.C. ¶ 61,268 (1990). *See Sea Robin I*, 127 F.3d at 370. The Fifth Circuit concluded that FERC had "reverted to its single factor, bright-line approaches that it had previously rejected as unworkable for offshore pipelines." *Id.* (citing *Northwest*

*Pipeline Corp.*, 905 F.2d at 1409; *EP Operating Co.*, 876 F.2d at 48). The Court also faulted the Commission for the reliance it placed on non-physical considerations, such as Sea Robin's ownership and shipper expectations. *See* 127 F.3d at 370–71 ("If the Commission is to remain tethered to the statute, as it must, that inquiry must be based primarily on physical criteria and the realities of the field."). The Fifth Circuit "intend[ed] that [non-physical criteria] be put in its place as considerations secondary to the physical factors." *Id.* at 371. Finally, the Fifth Circuit found FERC's "regulatory gap" argument, that a regulatory gap might arise if Sea Robin was held to be a gathering system, wanting: "Need for regulation cannot alone create authority to regulate." *Id.*

In remanding to the Commission, the Fifth Circuit acknowledged that "Sea Robin's system resists easy categorization because the logistics of offshore pipelines obscures differences between gathering gas from Gulf platforms and transporting it to the mainland." *Sea Robin I*, 127 F.3d at 370. It also observed that "the pattern of gathering and distribution on shore differs from the pattern of transportation and gathering of gas from the middle of the Gulf to the mainland," *id.*, and suggested that FERC "again consider the applicability of the primary function test to offshore pipeline systems and if necessary, reformulate this test." *Id.* at 367. The Court noted that on remand, "Sea Robin may choose to respond to the Commission's invitation to offer portions of its system as predominantly involved in a gathering or a transportation function." *Id.* at 371 (footnote omitted). In doing so, the Court specifically admonished the Commission that "[d]iscomfort in drawing the jurisdictional line at points internal to an overall system may be soothed with the reminder that Congress did not intend to extend FERC's jurisdiction to all natural gas

pipelines; indeed it demands the drawing of jurisdictional lines, even when the end of gathering is not easily located." *Id.* The Court opined that the Commission could "consider, for example, a distinction between the field south of the Vermilion Compressor Station and the pipelines leading north to Erath, Louisiana." *Id.*

On remand, FERC accepted the Fifth Circuit's invitation to reformulate its primary function test. *Sea Robin Pipeline Co.*, 87 F.E.R.C. ¶ 61,384, 1999 WL 444654 (1999) ("*Remand Order*"). In reformulating its primary function test, the Commission concluded that the "behind-the-plant" factor is not necessarily determinative of where gathering ends when applied to offshore facilities. *See id.* at 62,425. Further, FERC determined that it would "assess the physical configuration of offshore pipeline systems to determine if there exists a central location where gas is aggregated for further transportation to shore." *Id.* Such a location would be the "offshore analogue of the onshore 'central-point-in-the-field' criterion." *Id.* In cases where a pipeline system is configured to deliver gas collected from upstream wells to a centralized location through several relatively small diameter lines for further delivery onshore through a single larger diameter pipeline, that centralized aggregation location is considered by FERC to be analogous to the central-point-in-the-field factor and "given weight in identifying the demarcation point between gathering and transportation on OCS pipeline systems." *Id.* at 62,426. Thus, the Commission was willing to consider, as suggested by the Fifth Circuit, that the demarcation point between gathering and transmission on a system like Sea Robin's could be determined to be at a point internal to an overall pipeline system. *See Sea Robin Pipeline Co.*, 92 F.E.R.C. ¶ 61,072, at 61,-285 (2000) ("*Rehearing Order*").

Applying its reformulated primary function test, the Commission concluded that Sea Robin's pipeline facilities comprise two distinct components: a jurisdictional transportation system from the Vermilion 149 Station to Erath, and a non-jurisdictional gathering system upstream of the Vermilion 149 Station. *See Remand Order,* 87 F.E.R.C. at 62,426. FERC found that the primary function of the Vermilion–Erath line "is to transport to shore natural gas that has been delivered from many areas through a network-like configuration of relatively smaller diameter lines to a centralized point where gas is aggregated and compressed," namely the Vermilion 149 Station. *Id.* at 62,432.

In support of its decision to draw the jurisdictional line at the Vermilion 149 Compressor Station, the Commission emphasized certain key aspects of the system's overall physical configuration. Specifically, FERC found that the "straight-shot" geographical configuration of Sea Robin's system downstream of the Vermilion 149 Station, interconnecting with only two laterals delivering gas from only four wells along its 66.3–mile length, and the line's large 36–inch diameter are indicative of transportation. *See id.* at 62,430. In contrast, the facilities upstream of the Vermilion 149 Station interconnect with 45 laterals connected to 67 production platforms, and the lines are 30 inches or less in diameter. *See id.* at 62,431. Moreover, FERC found that the compression that occurs at Vermilion 149 "is typical of compression found on large diameter transportation lines transporting high volumes of gas over relatively long distances," rather than "field compression" associated with production. *Id.* at 62,430. According to FERC, the Vermilion 149 Station thus represented a central aggregation location

highly suggestive of the demarcation point between gathering and transportation. *See id.* at 62,431. The Commission concluded that in the "most fundamental meaning of the 'primary function' test, the 'totality of the circumstances' demonstrates that the primary function of the Vermilion–Erath Line is to transport to shore natural gas that has been delivered from many areas through a network-like configuration of relatively smaller diameter lines to a centralized point where the gas is aggregated and compressed," and these smaller lines upstream of Vermilion 149 are engaged in non-jurisdictional gathering. *Id.* at 62,432.

On rehearing, the Commission adhered to its position. *See Rehearing Order,* 92 F.E.R.C. at 61,284. FERC reiterated that its reformulated primary function test included: (1) consideration of an additional analytical element applicable where OCS pipeline facilities exhibit a "centralized aggregation point"; (2) adjustment in the weight to be afforded the behind-the-plant criterion on the OCS; and (3) a primary focus on physical factors. *Id.* at 61,285. It addressed arguments from the petitioners that all of Sea Robin's system was engaged in jurisdictional transportation, and arguments from Sea Robin that its system was engaged entirely in non-jurisdictional gathering.[4] Specifically the *Rehearing Order* identifies 13 physical factors considered in concluding that the facilities upstream of the Vermilion 149 Station are engaged in non-jurisdictional gathering. *See id.* at 61,291. These physical factors are:

(1) the 66.3 mile length of the Vermillion–Erath line;

(2) the 36–inch diameter of the Vermillion–Erath line;

4. Sea Robin no longer challenges FERC's *Remand Order* and supports the Commission's decision to draw the line between jurisdic- tional transportation and non-jurisdictional gathering at the Vermilion 149 Station.

(3) the straight-line configuration of the Vermillion–Erath line;

(4) the inverted-Y configuration of the Sea Robin System;

(5) the existence of only four platforms along the length of the Vermillion–Erath line as compared to the connections to 71 production platforms upstream of the Vermillion 149 Compressor Station;

(6) the abrupt change in physical attributes and configuration in the system occurring at the Vermillion 149 Compressor Station;

(7) the concentration of compression at the Vermillion 149 Compressor Station;

(8) the existence of a centralized aggregation location at the Vermillion 149 Compressor Station;

(9) the 4.5 to 24 inch diameters of the lines upstream of the Vermillion 149 Compressor Station;

(10) the existence of 45 laterals feeding into the two upstream arms of the inverted-Y upstream of the Vermillion 149 Compressor station;

(11) the presence of 71 production platforms connected to the system upstream of the Vermillion 149 Compressor station;

(12) the network configuration of Sea Robin's facilities upstream of the Vermillion 149 Compressor Station; and

(13) the onshore location of processing plants, which was not considered a determinative factor due to the geographic and technical characteristic of production and transportation offshore.

*Id.* Further, FERC rejected the argument that it had substituted the new "centralized aggregation point" criteria for its prior impermissible reliance on a single-factor test. Rather, it explained, "the centralized-aggregation-point is more appropriately viewed as a descriptive label for a set of a number of individual physical characteristics." *Id.* "Just as the historical behind-the-plant and central-point-in-the-field factors are based on the existence of a confluence of individual elements,. the new centralized-aggregation-point factor also is an example of an additional physical factor that can arise as the result of the combination of several individual physical components...." *Id.* at 61,292. Relying on the Fifth Circuit's *Sea Robin I* decision, the Commission rejected the suggestion that various production platforms, rather than the Vermilion 149 Station, are centralized aggregation points. *See id.*

Similarly, the Commission relied on the Fifth Circuit's decision to reject the suggestion that the reformulated primary function test would create an unlawful "regulatory gap" on the Outer Continental Shelf. *See id.* at 61,293 (citing *Sea Robin I*, 127 F.3d at 371). Moreover, FERC claimed to have addressed such "regulatory gap" concerns in its separate decision to promulgate regulations under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, to ensure that natural gas is transported in an open and nondiscriminatory manner. *Rehearing Order*, 92 F.E.R.C. at 61,293 (citing 65 Fed.Reg. 20,354 (Apr. 17, 2000)).

FERC also addressed arguments that it had given inadequate attention to the impact of the jurisdictional determination on the settled expectations of customers and on new upstream deepwater systems. The Commission found that the "remanding Court's directions on this point were clear. The Court ruled that while the practical effect of the determination of gathering is relevant, the primary consideration in formulating a jurisdictional test must be the physical characteristics that distinguish gathering from transmission." *Id.* at 61,-293–94 (citing *Sea Robin I*, 127 F.3d at 371). Thus, although FERC considered

these non-physical factors, the primary focus, as required by the Fifth Circuit, had to be the physical factors, and those factors supported drawing the jurisdictional line at the Vermilion 149 Station. *See id.* at 61,294.

Finally, FERC considered and rejected arguments that: (1) a 1978 amendment to OCSLA purportedly equated the scope of the "gathering" exemption in the Natural Gas Act with the concept of "feeder lines," *see id.*; (2) certificates issued to Sea Robin for the reclassified non-jurisdictional facilities must be subject to "abandonment" proceedings pursuant to section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b), *see id.* at 61,294–95; and (3) the fact that a jurisdictional upstream pipeline (the Garden Banks pipeline) delivers gas into the east leg of Sea Robin's system upstream of the Vermilion 149 Station prevents the Commission from reclassifying the Sea Robin system as non-jurisdictional. *See id.* at 61,295. On this last issue, petitioners contended that FERC had violated its prior ruling in *Tarpon Transmission Co.,* 60 F.E.R.C. ¶ 61,041, 1992 WL 166429 (1992), which they read as precluding pipeline facilities that carry gas delivered by a jurisdictional transportation pipeline from being classified as gathering facilities. FERC noted that this issue was raised for the first time on rehearing; however, the Commission went on to hold that the petitioners' reliance on *Tarpon* was misplaced. *See Rehearing Order,* 92 F.E.R.C. at 61,295. Although the presence of upstream transportation facilities was one factor considered in *Tarpon,* the real concern in that proceeding was that finding Tarpon's facilities to be engaged in non-jurisdictional gathering would have left shippers and producers unprotected from the exercise of monopoly power. *See id.* FERC concluded that such concerns were no longer relevant for facilities exempt from the Natural Gas Act because of the Commission's new

OCSLA anti-discrimination regulations. *Id.* at 61,295–96.

ExxonMobil and the Producer Coalition filed timely petitions for review challenging the *Remand Order* and the *Rehearing Order* in this Court.

## II. Analysis

The challenged orders are subject to reversal if the FERC's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this determination, "[t]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *see Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). To the extent that the petitioners are challenging FERC's interpretation of section 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b), we apply the two-step approach of *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). When Congress has spoken, we are bound by that pronouncement and that ends this Court's inquiry. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (*Chevron* step one). Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted) (*Chevron* step two).

In reviewing the Commission's determinations, we are mindful that "[t]he

line between jurisdictional transportation and non-jurisdictional gathering is not always clear." *Conoco*, 90 F.3d at 542. The jurisdictional determination under section 1(b) of the Act is "a line-drawing problem for which there is no easy answer." *Williams Field Servs.*, 194 F.3d at 118. Thus, "it is not this court's role to interpose its judgment." *Id.* Rather, we are mindful that in "evaluating and balancing the several factors under the primary function test, the Commission brings to bear its considerable expertise about the natural gas industry." *Conoco*, 90 F.3d at 544; *see also Lomak*, 206 F.3d at 1196–97; *Williams Field Servs.*, 194 F.3d at 118. "Accordingly, we will uphold the Commission's application of the test as long as it gives 'reasoned consideration to each of the pertinent factors' and articulates factual conclusions that are supported by substantial evidence in the record." *Lomak*, 206 F.3d at 1197 (quoting *Conoco*, 90 F.3d at 544); *see* 15 U.S.C. § 717r(b) ("The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."). The burden is on the petitioners to show that the Commission's choices are unreasonable and its chosen line of demarcation is not within a " 'zone of reasonableness' " as distinct from the question of whether the line drawn by the Commission is "precisely right." *Hercules Inc. v. EPA*, 598 F.2d 91, 107 (D.C.Cir.1978) (quoting *Federal Power Comm'n v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976)). We cannot say that the Commission acted unreasonably either in interpreting the Natural Gas Act or declining to exercise jurisdiction over portions of Sea Robin's system. Therefore petitioners have failed to carry their burden, and the petitions must be denied.

### A.

ExxonMobil challenges FERC's determination that the Vermilion 149 Station is a reasonable point at which the Commission may draw the line between non-jurisdictional gathering and jurisdictional transportation. It contends that the added compression at Vermilion 149 only serves to push and pull gas along an "integrated" transportation system. Petitioner proposes that the individual production platforms mark the point at which gathering ends and transportation begins. However, petitioner's differing interpretation of the physical factors present on the Sea Robin system does not provide us with a basis to upset the Commission's order. Reasonable people may disagree as to where gathering ends and transportation begins. Were we the Federal Energy Regulatory Commission, we might draw the line at Erath. Others might draw it at the production platforms themselves. *But see EP Operating Co.*, 876 F.2d at 49. But after considering the inherent ambiguity in the statute and the fact that "[t]he line between jurisdictional transportation and non-jurisdictional gathering is not always clear," *Conoco*, 90 F.3d at 542, (as it is not clear here) we simply cannot conclude that the Commission's choice of the Vermilion 149 Station as the dividing line was unreasonable, especially in light of the Fifth Circuit's decision on remand. *See Sea Robin I*, 127 F.3d at 371. We therefore hold that the Commission's choice, if not unassailable, is at least defensible, and survives the arbitrary-and-capricious review of the Administrative Procedure Act.

FERC relied on the smaller dimensions of the upstream lines in contrast to the 36–inch Vermilion–Erath line; the 45 laterals feeding into the two upstream arms; the 67 production platforms connected to the upstream facilities compared with only four downstream; the network configuration of the upstream facilities; and the need for added compression at the Vermilion 149 Station to move gas to shore. *See Rehearing Order*, 92 F.E.R.C. at 61,291–

All of these physical factors show a meaningful distinction between the facilities upstream and downstream of Vermilion 149 and make it reasonable to define it as the central aggregation point. Obedient to the Fifth Circuit's suggestion, FERC examined Sea Robin's system in parts, rather than as a whole, and reasonably concluded that different parts of the system required different jurisdictional treatment. Moreover, as described by the Commission, the central aggregation test is not a new, bright-line test, but rather is an amalgamation of physical factors, and in any event, is wholly consistent with past FERC precedent. It has long been the Commission's view, upheld by this Court, among others, that when gas from separate wells is collected by several lines which converge at a single location in the producing field for delivery into a single line for transportation, the separate lateral lines behind the central point are classified as non-jurisdictional gathering facilities. *Accord Barnes Transp. Co.*, 18 F.P.C. 369, 372 (1957). That aptly describes the Sea Robin system. At Vermilion 149 gas from several lateral lines is brought together and propelled to shore. The dissent is critical of FERC's determination because in its view, "[s]urely a 'fork in the road' cannot be the demarcation line between unregulated production/gathering and regulated transportation." Dis. Op. at 5. But why not? Cannot two roads diverging (or in this case, converging) make all the difference? Indeed, has that not always been the thrust of the Commission's "central-point-in-the-field" test? In this case, the forks of the "Y" gathered gas from production platforms at 67 receipt points, whereas the straight segment received gas at only four such points; the forks were pipes of smaller diameter than that of the straight segment; and the forks required less compression to move the gas along. Moreover, the line between gathering and transportation is inherently elusive, *see,*

*e.g., Conoco*, 90 F.3d at 542, and FERC "has wide discretion to determine where to draw administrative lines." *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C.Cir.2000). It is for the Commission, in the first instance, to determine the patterns of gathering and transportation in the offshore context. "We are generally 'unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn ... are patently unreasonable, having no relationship to the underlying regulatory problem.' " *Cassell v. FCC*, 154 F.3d 478, 485 (D.C.Cir.1998) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 60 (D.C.Cir.1977)). We conclude that petitioner has failed to carry its burden.

ExxonMobil makes much of the Supreme Court's language in *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 90, 83 S.Ct. 646, 649–50, 9 L.Ed.2d 601 (1963), in which the Court held that " 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." Thus, petitioner essentially contends that given the length and size of the upstream portion of Sea Robin's system, it cannot possibly be involved in gathering, as described by the Supreme Court. However, the Fifth Circuit expressly rejected FERC's *per se* reliance on length of a pipeline, holding that a 51–mile pipeline was non-jurisdictional. *EP Operating Co.*, 876 F.2d at 49. This same decision weighs against FERC's treating the production platforms as central aggregation points as well. *See id.* Rather, the Fifth Circuit required the Commission to recognize that "the pattern of gathering and distribution on shore differs from the pattern of transportation and gathering of gas from the middle of the Gulf to the mainland." *Sea Robin I*, 127 F.3d at 370; *see also Amerada Hess*, 52 F.E.R.C. at

61,988 (adopting the "modified primary function test" in response to *EP Operating Co.*, and in recognition of the "changing technical and geographic nature of exploration and production"). Given these different physical realities, what might not seem "narrowly confined" in the on-shore context, may well be on the Outer Continental Shelf. *Cf. West v. Gibson*, 527 U.S. 212, 218, 119 S.Ct. 1906, 1910, 144 L.Ed.2d 196 (1999) ("Words in statutes can enlarge or contract their scope as other changes, in the law or in the world, require their application."); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (statutory provisions often go beyond "the principal evil Congress was concerned with"). Given this backdrop, we cannot conclude that FERC's determination is unreasonable here.

Moreover, we have previously recognized the limited reach of the Supreme Court's holding in *Northern Natural*. In each case in which the Supreme Court "has applied this narrow definition of 'production' and 'gathering' to uphold the Commission's jurisdiction, the regulated entity was engaged in a jurisdictional activity." *Conoco*, 90 F.3d at 545. Thus, "when a natural gas company provided *bundled sales* and interstate transportation from its own wells to consumers and distributors, the Commission could properly include the company's production and gathering costs in its rate base for the *bundled service*." *Id.* We found that it was in the "context" of *bundled* jurisdictional and non-jurisdictional activities that "the Court defined 'gathering' narrowly, as limited to activities preceding sales for resale." *Id.* at 546 (citing *Phillips Petroleum*, 347 U.S. at 678, 74 S.Ct. at 796–97). But we now live in an unbundled world. *See id.* at 539–40 (observing that in Order No. 636, FERC "mandat[ed] the unbundling of gas sales and interstate transportation ... in order to give pipeline customers unimpeded access to the competitive wellhead market and to permit all gas sellers to compete on an equal basis"). Sea Robin is no longer involved in the sales of gas from the OCS–it is now strictly a transportation system. *Remand Order*, 87 F.E.R.C. at 62,428. Therefore the Supreme Court's restrictive definition of "gathering," while clearly relevant, must be considered in context. In the context of unbundled, off-shore pipeline systems, "the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution," *Northern Natural Gas*, 372 U.S. at 90, 83 S.Ct. at 650, cannot be as narrowly construed as on-shore. *Accord Sea Robin I*, 127 F.3d at 370; *EP Operating Co.*, 876 F.2d at 49; *Amerada Hess*, 52 F.E.R.C. at 61,988.

ExxonMobil faults the Commission for failing to give weight to the previously "settled status" of the classification of Sea Robin's pipeline as engaged in jurisdictional transportation. However, as alluded to above, these petitions, like those in *Conoco*, "arise in the wake of major regulatory changes in the natural gas industry." *Conoco*, 90 F.3d at 539. Whereas Sea Robin was once involved in sales and transportation, now it is strictly a transportation-only pipeline. When interstate gas pipelines served the multi-function role of purchasing, gathering, transporting, and re-selling natural gas, *i.e.* bundled sales, the transportation/gathering jurisdictional question may have been of less consequence. *See, e.g., El Paso Natural Gas Co.*, 72 F.E.R.C. ¶ 61,219, at 62,002, 1995 WL 544234 (1995) ("Under [a] bundled sales regulatory environment, the gathering/transmission function distinction was not as important as it is in a post-Order 636 environment [requiring unbundling].... Consequently, many facilities that actually perform a gathering function originally were construed under [Natural Gas Act] section 7 certificates."); *CNG Transmission Corp.*, 67 F.E.R.C.

¶ 61,330, at 62,177, 1994 WL 270455 (1994). Thus, the historical classification of Sea Robin's system is of limited utility. Moreover, the Fifth Circuit expressly instructed FERC in this case to relegate non-physical factors, such as the "settled status" of a pipeline, and the expectations of shippers to secondary status: "If the Commission is to remain tethered to the statute, as it must, that inquiry must be based primarily on physical criteria and the realities of the field." *Sea Robin I*, 127 F.3d at 371. The Fifth Circuit held that "general business activity and prior certification are relevant, but they are only part of the mix." *Id.* We agree. Therefore, as FERC adequately considered non-physical factors, but properly relied primarily on physical factors, again, we cannot find its decision to decline jurisdiction over a portion of Sea Robin's system unreasonable.

▮▮▮▮ Similarly, we find ExxonMobil's argument that FERC's jurisdictional ruling has created an "utterly illogical situation," wherein gas is transported on a jurisdictional pipeline (the Garden Banks pipeline) into a non-jurisdictional gathering leg of Sea Robin's pipeline, unavailing. Petitioners rely on *Tarpon Transmission Co.*, 60 F.E.R.C. ¶ 61,041, 1992 WL 166429 (1992), and *Trunkline Gas Co.*, 70 F.E.R.C. ¶ 61,163, 1995 WL 58234 (1995), for the proposition that the presence of an interconnection with an upstream jurisdictional facility compels a finding that the downstream facility is likewise jurisdictional. First, reliance on these orders for such a proposition is inherently suspect as in both instances the classification of the upstream system was in dispute, and in both cases the upstream system was reclassified as non-jurisdictional. If anything, this suggests that it is the Garden Banks pipeline, rather than Sea Robin, that has been erroneously classified. To hold that the Garden Banks pipeline's jurisdictional status compelled FERC to classify Sea Robin's system as jurisdictional would create a classic example of circular reasoning. When Garden Banks requested a non-jurisdictional gathering classification, FERC ruled that it was jurisdictional *because it was located "proximate to jurisdictional lines."* Shell Gas Pipeline Co., 74 F.E.R.C. ¶ 61,277, at 61,897, 1996 WL 111350 (1996) (emphasis added). Thus, proximity to Sea Robin, among other pipelines, resulted in Garden Banks's jurisdictional classification. To now hold that Garden Banks's interconnection with Sea Robin requires the latter to also be jurisdictional, is for the tail to wag the dog. Perhaps the present inconsistent treatment of the Garden Banks pipeline and the Sea Robin pipeline is "positively absurd," as suggested by the dissent, Dis. Op. at 7, but that does not mean that the problem is necessarily with Sea Robin's classification. FERC has been struggling with the reclassification of facilities in the wake of the unbundling of gas sales and interstate transportation in Order No. 636. *See Conoco*, 90 F.3d at 539–41. As it is entirely appropriate for FERC to proceed on a case-by-case basis, *see SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947), then "the reform may take one step at a time." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). We do not mean to pre-judge how FERC might apply its reformulated primary function test to Garden Banks. We only conclude that the status of the Garden Banks pipeline does not render the Commission's reclassification of portions of Sea Robin's system unreasonable.

▮▮▮ We turn now to ExxonMobil's least persuasive argument—that FERC's determination that portions of Sea Robin's system are engaged in non-jurisdictional gathering results in a "regulatory gap." We find this argument no more persuasive

than did the Fifth Circuit. We emphatically agree that "[n]eed for regulation cannot alone create authority to regulate." *Sea Robin I,* 127 F.3d at 371. Rather it is *statutory authorization* alone that gives FERC the authority to regulate, and in the absence of such authority, FERC's action " 'is plainly contrary to law and cannot stand.' " *Atlantic City Elec. Co. v. FERC,* 295 F.3d 1, 8 (D.C.Cir.2002) (quoting *Michigan v. EPA,* 268 F.3d 1075, 1081 (D.C.Cir.2001)). Here Congress clearly contemplates that the Commission will not have jurisdiction under the Natural Gas Act over "the production or gathering of natural gas." 15 U.S.C. § 717(b). The language could not be any plainer. We have repeatedly admonished federal agencies that jurisdiction may not be *presumed* based solely on the fact that there is not an express withholding of jurisdiction. *E.g., Atlantic City Elec. Co.,* 295 F.3d at 8–9; *Michigan,* 268 F.3d at 1082; *American Petroleum Inst. v. EPA,* 52 F.3d 1113, 1119–20 (D.C.Cir.1995); *Ethyl Corp. v. EPA,* 51 F.3d 1053, 1060 (D.C.Cir.1995). Where Congress has gone so far as to *expressly* delineate the limits of agency jurisdiction, we cannot fault the Commission for taking a conservative view of its own authority.

▆▆▆ Finally, we can quickly dispense with ExxonMobil's argument that Sea Robin's system was subject to abandonment proceedings under section 7(b) of the Act, 15 U.S.C. § 717f(b). Simply put, Sea Robin does not seek to abandon any facilities or services. Rather, it merely seeks to be able to continue operating previously certificated facilities as gathering facilities, exempt from FERC's jurisdiction under the Natural Gas Act. This is not "abandonment" within the meaning of section 7(b). *Cf. Conoco,* 90 F.3d at 553. In addition, section 7(b) only applies to jurisdictional facilities, and "do[es] not expand the Commission's § 1(b) jurisdiction." *Id.*

Therefore it cannot be used to bootstrap FERC jurisdiction here.

### B.

▆▆▆ The Producer Coalition argues that the scope of the "gathering" exemption under section 1(b) of the Natural Gas Act is defined by the concept of "feeder lines" in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* Under OCSLA, the Commission is responsible for ensuring open and nondiscriminatory access to transportation of oil and gas for all shippers on the Outer Continental Shelf. 43 U.S.C. § 1334(f)(1)(A). FERC, however, may exempt from OCSLA's requirements "any pipeline or class of pipelines which feeds into a facility where oil and gas are first collected or a facility where oil and gas are first separated, dehydrated, or otherwise processed." 43 U.S.C. § 1334(f)(2). The Producer Coalition contends that the scope of exemption for "feeder lines" is coterminous with "gathering" facilities under the Natural Gas Act. Thus, in essence the Producer Coalition contends that FERC's reformulated primary function test is unnecessary and that the Commission has stumbled under *Chevron* step one.

In support of its position, the Producer Coalition relies on bits and pieces of legislative history surrounding the 1978 Amendments to OCSLA. But snippets of legislative history do not a law make. *Accord Aldridge v. Williams,* 44 U.S. (3 How.) 9, 24, 11 L.Ed. 469 (1845); *In re Sealed Case,* 237 F.3d 657, 669 (D.C.Cir. 2001) ("The limits on the Commission's authority—like that authority itself—are derived from statutory provisions, not from loosely worded fragments extracted from congressional reports and speeches"). Petitioners offer no direct evidence of congressional intent to fill in the Natural Gas Act definition of "gathering" *sub silentio*

by reference to the feeder line concept. Indeed, there is no definition of "gathering" in the OCSLA, and it does not even use the term. Rather the Producer Coalition relies on isolated excerpts from the floor discussion by Congressman Sieberling. While Congressman Sieberling may have spoken, Congress has not.

Morever, it would be anomalous to treat the "feeder line" provision of OCSLA and the "gathering" exemption of the Natural Gas Act as redundant. Under the Producer Coalition's interpretation, in enacting the OCSLA Amendments, Congress would have replicated the non-discriminatory provisions already contained in the Natural Gas Act. *Compare* 43 U.S.C. § 1334(f)(a)(1)(A) (OCSLA), *with* 15 U.S.C. §§ 717c(b), 717d(a) (Natural Gas Act). Likewise, there would have been no need to authorize the Commission to exempt "feeder lines" from FERC jurisdiction if they were already exempt as gathering facilities. Rather, a more plausible inference is that Congress amended OCSLA to make OCS facilities not covered by the Natural Gas Act subject to similar nondiscriminatory requirements, with the exception of "feeder lines." However, we do not decide whether it would be reasonable for FERC to equate the feeder line and gathering facilities exemptions. We simply hold that FERC's interpretation of section 1(b) of the Natural Gas Act is not unreasonable, and therefore *Chevron* deference is applicable.

### III. Conclusion

FERC's jurisdiction over natural gas pipelines "demands the drawing of jurisdictional lines, even when the end of gathering is not easily located." *Sea Robin I*, 127 F.3d at 371. Although we might draw a different line, we cannot say that the Commission acted unreasonably in concluding that the Vermilion 149 Station is the place where nonjurisdictional gathering ends and jurisdictional transportation

begins. It is not our role to substitute our own judgment for that of the agency. Given the instructions of the United States Court of Appeals for the Fifth Circuit on remand, we cannot say that FERC has failed to give appropriate consideration to the primary physical factors and the secondary non-physical factors of its reformulated primary function test. Therefore the petitions for review are denied.

*So ordered.*

HARRY T. EDWARDS, Circuit Judge, dissenting.

The issue in this case focuses on the line between the "transportation" of natural gas and the "gathering" of natural gas. For many years, most of the Sea Robin Pipeline Company complex in the Gulf of Mexico has been designated as a *transportation* facility, and, thus, within the jurisdiction of the Federal Energy Regulatory Commission ("FERC" or "Commission") under the Natural Gas Act ("NGA"). Now, however, the Commission has partially reversed that settled status, reclassifying a major segment of the Sea Robin pipeline as engaged in nonjurisdictional gathering. In my view, FERC's decision is devoid of reasoned decision making. I therefore dissent from the court's decision denying the petition for review.

\* \* \* \*

Sea Robin operates a massive pipeline complex (438 miles overall), almost all of which is located offshore on top of the Outer Continental Shelf ("OCS") in the Gulf of Mexico. This system is shaped like an inverted "Y," whose two arms sweep across the OCS to meet at a point approximately 50 miles off the coast of Louisiana. The Vermillion 149 Compressor Station sits at this point of convergence. There, much of the gas flowing from various production platforms that feed into the system

comes together for shipment 66 miles north to Sea Robin's onshore processing plants near Erath, Louisiana. During the journey to Erath, the aggregated gas is joined by additional gas from four platforms located closer to the shore. Once the gas reaches shore, it is separated, dehydrated, and processed, then transported to the Erath Compressor Station from whence it is pumped into interstate pipelines for downstream delivery. (See Appendix.)

Before the challenged reclassification of the Sea Robin system, once the gas was produced and gathered at the production platforms south (upstream) of Vermillion, it was deemed to be in "transportation," and thus within FERC's jurisdiction. In 1995, Sea Robin sought to undo this regulatory situation. The company asked FERC for an order declaring that its pipelines were gathering facilities exempt from the Commission's jurisdiction under the § 1(b) of the NGA. FERC refused, holding that the primary function of Sea Robin's system was transportation. *Sea Robin Pipeline Co.,* 71 F.E.R.C. (CCH) ¶ 61,351, 1995 WL 361806 (1995). Rehearing was sought, but denied, *Sea Robin Pipeline Co.,* 75 F.E.R.C. ¶ 61,332, 1996 WL 355518 (1996), leading Sea Robin to petition for review in the Fifth Circuit. The court granted the petition, remanding the case to FERC for further consideration. *Sea Robin Pipeline Co. v. FERC,* 127 F.3d 365 (5th Cir.1997) ("*Sea Robin I*").

*Sea Robin I* held that the Commission's decision to deny reclassification was arbitrary and capricious because the agency did not fairly apply the "primary function" test that it had adopted as the touchstone for its analysis. In *Farmland Industries, Inc.,* 23 F.E.R.C. ¶ 61,063, 1983 WL 39391 (1983), and subsequent decisions, FERC had identified six factors that were to

guide the functional inquiry into whether a pipeline is a gatherer or a transporter:

(1) the diameter and length of the facility

(2) the location of compressors and processing plants

(3) the extension of facility beyond the central point in the field

(4) the location of wells along the facility

(5) the geographical configuration of the field

(6) the operating pressure of the line

*See EP Operating Co. v. FERC,* 876 F.2d 46, 48 (5th Cir.1989).

This test was developed for, and most readily applies to, land-based pipeline facilities. In order to account for the differences between onshore and offshore facilities, FERC subsequently attempted to refine the above analysis. *See Amerada Hess Corp.,* 52 F.E.R.C. ¶ 61,268, 1990 WL 1241336 (1990). Because technological advances had allowed drilling and gas production to take place further and further from land, gathering pipelines of increasing length and diameter were being used in places such as the OCS. This reality suggested to FERC that it adopt a "sliding scale" approach to the physical factors identified in *Farmland*: the deeper and further from shore a pipeline, the longer and wider it could be and still be deemed a gatherer. Moreover, in order to ensure that such pipes were properly classified, the agency announced that it would consider certain non-physical factors when applying the primary function analysis. These include the (1) purpose, location, and operation of the facility; (2) the general business activity of the facility; and (3) the overall objectives of the NGA and Natural Gas Policy Act. *Id.* at 61,988.

*Sea Robin I* held that the Commission erred in selectively applying the *Farmland*

factors, over-relying on the nonphysical factors described in *Amerada Hess*, and failing to apply the "sliding scale." First, the court held that the Commission impermissibly "reduced the primary function analysis to a litmus test that turned on the length and diameter of the overall system." 127 F.3d at 370. That is, FERC classified Sea Robin's system as one engaged in transportation simply because of the size of its pipes alone, deeming the other *Farmland* factors inapplicable. In so doing, the Commission abandoned, "without reasoned consideration," its earlier recognition that the exigencies of moving offshore gas long-distances to land may require larger pipelines that should not necessarily be classified as transporters. *Id.*

Second, *Sea Robin I* criticized the agency for treating the non-physical factors as the equals of the physical factors in making the gathering/transportation distinction. The Fifth Circuit reminded FERC that this distinction, as understood by Congress, was primarily a tangible, operational one. As such, while non-physical criteria may be considered, they must remain a secondary "part of the mix," not the starting point for the rest of the analysis. *See id.* at 370-71. Because FERC seemed to have misunderstood these points, the court remanded the case, suggesting that the Commission

> may reformulate its primary function test. It may choose to discontinue criteria not relevant to the physical, geographical, and operational characteristics of pipelines in the OCS. The record suggests other criteria, such as the quality of the gas in the pipelines and the depth of the water in the offshore production area, that may be relevant to the inquiry.

*Id.* at 371.

The court recognized that the agency might be able to justify drawing the jurisdictional line between gathering and transportation at a point internal to the Sea Robin system, but this suggestion was offered merely in passing dicta. Nothing in the Fifth Circuit's opinion in *Sea Robin I* in any way *compelled* FERC to draw the jurisdictional line at a point internal to Sea Robin's overall system. Nor did anything in the court's opinion *compel* the Commission to select the Vermillion Compressor Station as the dividing point between non-jurisdictional gathering and jurisdictional transportation. FERC, however, apparently threw up its hands in dismay upon reviewing *Sea Robin I* – obviously having no clue what to do to adhere to the court's mandate – and simply opted for Vermillion as the jurisdictional dividing line because it is "central" to the Sea Robin system.

This is the kind of case in which a judge welcomes the opportunity to defer to the expert judgment of a regulatory agency. However, I can find no evidence of FERC "expertise" in operation in this case. Indeed, I view FERC's decision as totally lacking in reasoned decision making. Because of the Commission's inexplicable reliance on some passing dicta in *Sea Robin I*, its failure to offer a coherent explanation for the choice of Vermillion as the jurisdictional dividing line, and its complete failure to explain why it ignored other choices open to it, I can find no basis upon which to defer to the agency's decision. I therefore dissent.

\* \* \* \*

My starting point is the Supreme Court's oft-quoted statement in *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 90, 83 S.Ct. 646, 649–50, 9 L.Ed.2d 601 (1963):

> '[P]roduction' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and

preparing it for the first stages of distribution.

In this case, Vermillion is a point where gas coming from different production platforms comes together to be transported further north; but Vermillion is not a place where gas is either *produced* or *gathered.* The production and gathering is done at the many production platforms south of Vermillion – this always has been FERC's understanding, and there are no changed circumstances in this case to justify a different conclusion.

Vermillion is merely a junction in the pipeline, where gas from two preceding forks in the pipeline road come together before the gas travels north in one pipe instead of two. Nothing else of any consequence happens at Vermillion – nothing. Surely a "fork in the road" cannot be the demarcation line between unregulated production/gathering and regulated transportation. Vermillion is not a place where Sea Robin engages in any "*physical acts of drawing the gas from the earth and preparing it for the first stages of distribution*"; it is not, therefore, a place of production and gathering as those terms have been "narrowly" defined by the Supreme Court.

\* \* \* \*

As I read the Commission's orders now under review, once FERC identified what it thought was the central point in the field, the Vermillion Station, it then largely ignored the physical characteristics of the pipelines that lay upstream (south) of that point. But, as petitioners rightly point out, those characteristics (size, pressure, configuration) are entirely compatible with a transportation function. If FERC meant to view the Sea Robin system in terms of its consistent parts, rather than as an integrated whole (as it had done prior to the Fifth Circuit's decision), the Commission should have applied its new analysis to each part of the facility that it

sought to exempt from its regulatory jurisdiction. That, at least, seems to be the central *holding* of *Sea Robin I. See* 127 F.3d at 371 ("If the Commission is to remain tethered to the statute, as it must, [the jurisdictional] inquiry must be based primarily on physical criteria and the realities of the field."). The court's suggestion that FERC might analyze the various parts of the field was not an invitation to ignore the relevant physical properties of the Sea Robin facility.

FERC's focus on the purported *central point* of the Sea Robin field would have been plausible only if the agency had carefully examined the specifications of the entire pipeline system, both upstream and downstream of its designated midpoint. Indeed, FERC apparently understood this. *See Sea Robin Pipeline Co.,* Order Denying Rehearing, 92 F.E.R.C. (CCH) ¶ 61,-072, at 61,291-92, 2000 WL 1100267 (2000). FERC, however, failed to make good on this understanding. The Commission claims to rely on the size of the pipes, the number of cross-connections, and the pressure of the gas in order to distinguish the lines downstream of Vermillion from those upstream. *See id.* However, none of these factors is relevant, because not one supports the demarcation of gathering and transportation at Vermillion. On the upstream trunk legs, just as on the Vermillion-Erath line, raw highly pressurized gas is propelled over long distances through relatively wide pipes toward land. In other words, the so-called "central point" of the field is utterly irrelevant to a determination of the point where non-jurisdictional production and gathering become regulated transportation.

While the downstream, northern portion of the line may be punctuated by relatively few lateral connections (four), there are also only four laterals interrupting the final stage of the left trunk leg that runs

toward Vermillion. Yet, FERC never examined whether the primary function of that upstream segment might be transportation.

FERC mentions the existence of compression at Vermillion, as if to suggest that this is a relevant consideration for purposes of comparison. It is not. The Sea Robin compressors both push and pull gas through the system, *pressurizing lines both upstream and downstream*. Indeed, in an earlier order, the Commission explicitly noted that pressure upstream of Vermillion "is similar to that of other offshore systems found to be transmission facilities." 71 F.E.R.C. at 62,402. FERC has never suggested that there is any *greater* pressure in the downstream segment. In fact, the *only* physical change that takes place at Vermillion is a marginal increase in the diameter of the pipelines heading north, which is hardly surprising in light of the fact that two upstream pipelines converge into one at the Vermillion junction. And while the pipes do get larger, the upstream trunk lines are also quite wide; indeed, the Commission's previous decisions recognize that those lines are just as compatible with transportation as the final Vermillion-Erath line. *See id.* at 62,398 ("Sea Robin's system is of the diameter and length that are more typical of an interstate transportation system rather than an exempt gathering system.").

FERC has thus asked this court to validate a determination that "gathering" ends where two large lines become one and grow proportionately wider as a result. This proposition is perplexing on its own terms, and it is unlawful in light of what we have been told by the Supreme Court in *Northern Natural Gas Co.,* namely, that production and gathering entail only "the physical act[] of drawing the gas from the earth and preparing it for the first stages of distribution." 372 U.S. at 90, 83 S.Ct. at 650. The gas itself undergoes no alteration at Vermillion, nor does any event occur beyond the aggregation of gas that has already been partially aggregated, and will be further aggregated once it is processed for interstate distribution. Given these facts, there is no basis that I can discern for how the lines immediately upstream of Vermillion have as their primary function the gathering of natural gas while those immediately downstream do not.

The Commission's reclassification decision becomes positively absurd when it is considered in the light of the "Garden Banks" transportation pipeline. The Garden Banks segment of line is south (upstream) of Vermillion and it is concededly a pipeline segment that is subject to FERC's regulatory jurisdiction. *See Shell Gas Pipeline Co.,* 74 F.E.R.C. ¶ 61,277, 1996 WL 111350 (1996). Yet, as a result of FERC's reclassification of the Sea Robin system, a situation has been created in which a jurisdictional "transportation" line (Garden Banks) flows into a non-jurisdictional pipeline segment upstream of Vermillion. Not surprisingly, FERC has previously disapproved of such situations, for it is facially illogical to have gas being *transported* to where it is *gathered* only then to be *transported* again. *See Trunkline Gas Co.,* 70 F.E.R.C. ¶ 61,163, 1995 WL 58234 (1995); *Tarpon Transmission Co.,* 60 F.E.R.C. ¶ 61,041, 1992 WL 166429 (1992). The Commission offers no reasonable justification for this unseemly situation, arguing meekly that this one factor should not be considered because other factors support FERC's judgment.

This all might make sense had FERC no other serious options to consider in discharging its line-drawing responsibilities. Such was not the case, however, as the Commission had before it, and ignored, another viable division point: the offshore production platforms. In previous decisions, FERC has found such platforms to

be "the central point in an offshore gas field where numerous wells are produced on the platform and raw production from other wells is transported to the platform through short flowlines." *Amerada Hess Corp.*, 47 F.E.R.C. (CCH) ¶ 61,187, at 61,-623, 1989 WL 261393 (1989), *modified on reh'g on other grounds* 52 F.E.R.C. ¶ 61,-268, 1990 WL 1241336 (1990).

In this case, the Commission never explained away these precedents, nor tried to justify its implicit – and by no means obvious – decision to treat the entire Sea Robin system as a single production field, with one central point, rather than as an aggregation of smaller fields, each with a central point, which in turn feed into the trunk lines for downstream transportation. This approach was presented by the gas producers below; FERC's decision to ignore it was, in my view, arbitrary and capricious. *See Farmers Union Cent. Exchange, Inc. v. FERC,* 734 F.2d 1486, 1511 (D.C.Cir.1984) ("It is well established that an agency has a duty to consider reasonable alternatives to its chosen policy, and to give a reasoned explanation for its re-jection of such alternatives."). Indeed, ignoring this reasonable alternative allowed the Commission to pay scant attention to the very thing that it was supposed to rely on most heavily: the physical properties of the facilities whose jurisdictional status it was endeavoring to determine.

In sum, under FERC's new legal regime, "gathering" ends where the widest pipe on a pipeline system starts and where the gas begins to flow on a direct angle to its processing plant. This approach takes insufficient account of those physical realities that might suggest a different demarcation point between gathering and transportation, and, as applied here, led the Commission to a result that is difficult to square with the language of the statute, with the language of the Supreme Court, and with the holding (as opposed to the dicta) of the Fifth Circuit. Because the agency neither explains the discrepancy between its jurisdictional line and the one described by Congress, nor why it ignored plausible alternatives to that line, FERC is owed no deference in this case. I respectfully dissent.